| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>DANIEL J. HEALY | DOCKET NO.<br>**09 - 0233M**<br><br>MAGISTRATE'S CASE NO.<br>09- <br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>FEB 3 2009<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY |

Complaint for violation of Title 21, United States Code, Section 846

| NAME OF MAGISTRATE JUDGE<br>CHARLES F. EICK | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>February 2006<br>until Present | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

From in or about February 2006 until the present, defendant DANIEL J. HEALY and others known and unknown conspired and agreed with each other to knowingly and intentionally distribute and dispense controlled substances, namely, oxycodone, a Schedule II narcotic controlled substance, and hydrocodone, a Schedule III narcotic controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
   (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Mark Nomady |
|---|---|
| | OFFICIAL TITLE<br>Special Agent-Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>February 3, 2009 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA DMH:ia        REC: DETENTION

**AFFIDAVIT**

I, Susannah Herkert, hereby swear and affirm as follows:

**TRAINING AND EXPERIENCE**

1.      I am an investigative officer of the United States within the meaning of Title 21 of the United States Code, and have been so employed as a Diversion Investigator with the United States Drug Enforcement Administration ("DEA") since February, 2005.  I am assigned to the Los Angeles Field Division, tasked to investigate the illicit diversion of controlled substances by DEA registrants. I have received three months of specialized training in diversion investigations at the Drug Enforcement Administration, Department of Justice Training Center, Quantico, Virginia, including the manner in which controlled substances are diverted, marketed, and consumed.  As a DEA Diversion Investigator, I have become familiar with the manner in which controlled substances are distributed within the licit and illicit market, the methods of payment for such controlled substances, and the efforts involved in such activity to avoid detection by law enforcement.  Additionally, I have participated in many aspects of pharmaceutical investigations and have been the lead investigator in numerous pharmaceutical investigations.

2.      Based on my training and experience, I am familiar with the methods used by pharmaceutical controlled substance diverters to conceal the nature of their illegal activity.  I have received training and have collaborated with other law enforcement agencies concerning investigations involving the unlawful possession and distribution of controlled substances.

**PURPOSE OF AFFIDAVIT**

3.      This affidavit is made in support of the following:

a.      A complaint against, and warrant for the arrest of, Daniel HEALY, M.D.

1

("HEALY") for distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846.

      b.     A search warrant to search the following locations for evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846:

      i.     SUBJECT PREMISES-1: KIND CARE MEDICAL CENTER OF DANIEL J. HEALY, located at 1755 E. Huntington, Suite 104, Duarte, California 91010. SUBJECT PREMISES-1 is the medical office of Daniel HEALY, M.D. Suite 104 is located on the first floor of the two-story office complex on the Northwest corner of the intersection of Huntington and Highland, in Duarte, California. Construction is concrete with glass windows. "DANIEL J.HEALY, M.D, Family Practice, Weight Control" is in large black lettering on the side of SUBJECT PREMISES-1. "Weight Control and Urgent Care is in white lettering on front windows of SUBJECT PREMISES-1. HEALY owns, operates, and practices medicine at this location and numerous individuals who do not have medical necessities have obtained controlled substances there.

      ii.     SUBJECT PREMISES-2: 1139 Valencia Way, Arcadia, California. SUBJECT PREMISES-2 is a house in which HEALY lives, along with his girlfriend A.C. SUBJECT PREMISES-2 is located at 1139 Valencia Way, Arcadia, California 91006. The house is located on the west side of Valencia Way. It is a red brick two-story house with a driveway leading to a brown/white garage door. The front door to SUBJECT PREMISES-2 is located to the North of the garage door. The numbers "1139" are in black letters on the curb in front of SUBJECT PREMISES-2.

      iii.     SUBJECT PREMISES-3: A 2004 Honda, California license plate 5WZF879, VIN# 2HGES16574H554695. I queried the California Department of Motor Vehicles

database on January 19, 2009, and learned that SUBJECT PREMISES-3 is registered to Daniel

James HEALY or E. H. Healy at the address of SUBJECT PREMISES-1.

     iv.  SUBJECT PREMISES-4: A 1998 Mercedes-Benz, California license

plate 5AAX612, VIN #WDBHA23G0WA586219. I queried the California Department of Motor

Vehicles database on January 19, 2009, and learned that SUBJECT PREMISES-4 is registered to

Daniel J. HEALY at the address of SUBJECT PREMISES-2.

   4.  HEALY is a medical doctor currently licensed by the State of California. I have

investigated HEALY's registration and licensing records with DEA and the Medical Board of

California, and I have learned the following:

     a.  HEALY's California Medical License is currently listed as "license renewal

pending" and expires on March 31, 2009. The definition of a "license renewal pending" is listed on

the Medical Board of California website as: "Licensee failed to certify compliance with the

continuing medical education requirements and/or failed to certify that he or she disclosed the names

of those health-related facilities in which the licensee and/or family may have a financial interest.

Practice is permitted unless license expires."

     b.  HEALY currently maintains a DEA registration, which is required for

ordering, prescribing, administering, and/or dispensing controlled substances.

     c.  HEALY currently maintains a registration as a detoxification doctor. I know

from my training and experience that an individual practitioner may dispense or prescribe Schedule

III, IV, or V narcotic controlled drugs or combinations of narcotic controlled drugs which have been

approved by the Food and Drug Administration specifically for use in maintenance or detoxification

treatment. I know from my training and experience that the practitioner must be a "qualifying

3

physician," which means he is licensed under state law and has specific medical certification, training, or experience in maintenance or detoxification treatment as specified in the Controlled Substances Act.    I know from my training and experience that HEALY's registration as a detoxification doctor may make his clinic a drug abuse "program" under 42 C.F.R., part 2, and may make HEALY a "program director" or "person holding the records" under 42 C.F.R., part 2. For that reason, the government is submitting contemporaneously with this affidavit an ex parte application and proposed order authorizing disclosure and use of records to investigate or prosecute a drug abuse program or the person holding the records for a drug abuse program, pursuant to 42 C.F.R. § 2.66. I know from my training and experience that DEA is an investigative and law enforcement agency.

d.       HEALY operates a clinic in Duarte, California (SUBJECT PREMISES-1).

As set forth further below, based on evidence obtained in this investigation, there is probable cause to believe that HEALY has accepted cash for dispensing huge quantities of controlled substances that are not medically necessary or indicated. As a result, highly addictive prescription controlled substances, including oxycodone and hydrocodone, have been diverted from legitimate medical use into the community for an illegitimate use.

5.       This affidavit is intended to show that there is sufficient probable cause for the requested complaint, arrest warrant and search warrants. This affidavit is not intended to be a complete statement of all known information of evidentiary value, and it does not purport to set forth all of my knowledge of, or investigation into, this matter. This affidavit is based on personal knowledge that I have gained from my participation in this investigation as well as information from the following sources, among others:

4

a.    Oral and written reports and other supportive documentation about this investigation, and others, which I have received from other federal agents and other law enforcement agencies, as well as conversations with such law enforcement officers and agents.

b.    Physical surveillance conducted by federal agents or local law enforcement agencies which have been reported to me either directly or indirectly.

c.    Information provided by a pharmacist and former patients, and other sources of information.

## PREMISES TO BE SEARCHED

6.    The premises to be searched (the "SUBJECT PREMISES") are further described in Attachment A and are as follows:

a.    SUBJECT PREMISES-1: KIND CARE MEDICAL CENTER OF DANIEL J. HEALY ("OFFICE"), located at 1755 E. Huntington, Suite 104, Duarte, California.  SUBJECT PREMISES-1 is HEALY's medical office.  Suite 104 is located on the first floor of the two-story office complex on the Northwest corner of the intersection of Huntington and Highland, in Duarte, California.  Construction is of concrete with glass windows. "DANIEL J.HEALY, M.D, Family Practice, Weight Control" is in large black lettering on the side of the SUBJECT PREMISES-1. "Weight Control and Urgent Care is in white lettering on front windows of SUBJECT PREMISES-1. A photograph of SUBJECT PREMISES-1 is included in Attachment A.

b.    SUBJECT PREMISES-2: 1139 Valencia Way, Arcadia, California. SUBJECT PREMISES-2 is a house in which HEALY lives, along with his girlfriend A.C. SUBJECT PREMISES-2 is located at 1139 Valencia Way, Arcadia, California 91006. The house is located on the west side of Valencia Way.  It is a red brick two-story house with a driveway leading

to a brown/white garage door. The front door to SUBJECT PREMISES-2 is located to the North of the garage door. The numbers "1139" are in black letters on the curb in front of SUBJECT PREMISES-2. A photograph of SUBJECT PREMISES-2 is included in Attachment A.

        c.      SUBJECT PREMISES-3: A 2004 Honda, California license plate 5WZF879, VIN# 2HGES16574H554695 (Honda). I queried the California Department of Motor Vehicles database on January 19, 2009, and learned that SUBJECT PREMISES-3 is registered to Daniel James HEALY or E. H. Healy at the address of SUBJECT PREMISES-1.

        d.      SUBJECT PREMISES-4: A 1998 Mercedes Benz, California license plate 5AAX612, VIN #WDBHA23G0WA586219 (Mercedes). I queried the California Department of Motor Vehicles database on January 19, 2009, and learned that SUBJECT PREMISES-4 is registered to Daniel J. HEALY at the address of SUBJECT PREMISES-2.

## PROBABLE CAUSE FOR ITEMS TO BE SEIZED

        7.      Based on my training, education, experience and discussions with other law enforcement officers, I know that:

        a.      Persons involved in drug trafficking, including medical professionals, often keep controlled substances, proceeds of drug sales, records of drug transactions and other records within their residences and businesses or within ready access, i.e. in their storage areas and vehicles, and conceal such items from law enforcement authorities. The drugs/prescriptions may be sold but documentary records and ledgers remain.

        b.      Persons involved in drug trafficking, including medical professionals, often maintain large amounts of currency in their residences and businesses, safe deposit boxes, and

storage areas in order to finance their ongoing illegal activities and other businesses; as well as use currency to pay bills, to acquire assets, and to make other purchases.

        c.      It is common knowledge within the law enforcement community that drug transaction records, books, account ledgers, payments, or notes and other evidence of financial transactions relating to obtaining, transferring, and spending substantial sums of money which result from engaging in drug trafficking activities are often maintained at or in residences, businesses, safe deposit boxes, vehicles, and storage areas of these persons.

        d.      Persons involved in drug trafficking, including medical professionals, often retain personal and business notes, letters, and correspondence relating to their narcotics/ prescription orders at their residences, businesses, vehicles, safe deposit boxes and in storage areas.

        e.      Persons involved in drug trafficking, including medical professionals, generally retain telephone and address books and appointment books identifying additional individuals, including "patients," involved in illegal trafficking of controlled substances and telephone toll records. Additionally, these persons generally retain documents or records which establish control of their premises and registered vehicles, including utility bills, cancelled checks, envelopes and deeds, leases, and titles and vehicle registrations.

        f.      Persons involved in drug trafficking, including medical professionals, commonly utilize telecommunication devices to further their illegal operations and communicate with associates, including telephones, mobile telephones, cellular telephones, and digital paging devices.

        g.      Persons involved in drug trafficking, including medical professionals, often have firearms to protect the proceeds of their drug trafficking. For example, during a federal search

warrant for evidence of drug trafficking executed at a doctor's residence in November 2006, DEA agents found numerous loaded handguns and a rifle in various rooms throughout the residence. When interviewed about the firearms, the doctor told DEA agents he also carried a gun with him in the trunk of his vehicle, especially if he was carrying a lot of cash home from work.

   h. Doctors routinely maintain patient files in their offices where they see patients. I also know that under California State Law, doctors are required to keep records of the controlled substance prescriptions they write and the controlled substances they dispense, and that doctors routinely keep these records at their offices where they see patients. I also know that doctors keep these types of patient records and controlled substance records in computers or in other electronic forms. I also know based on my training and experience that doctors transport their patient records and documents in their vehicles to other locations, including their residences, to review and update these records.

## OVERVIEW OF THE LAW AND POLICY REGARDING PRESCRIPTION MEDICATION

  8. Based on my training and experience, I know that the distribution of controlled substances must meet certain federal rules and regulations. Specifically, I know the following:

   a. Title 21 U.S.C. § 812 establishes schedules for controlled substances which present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on that drug. Such controlled substances are listed in Schedule I through Schedule V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. Pharmaceuticals are listed as controlled substances, from Schedule I through V because they are considered dangerous. There are other drugs which are available only by prescription but are not classified as controlled substances.

b.    Pursuant to Title 21 U.S.C. § 822, controlled substances may only be prescribed, dispensed or distributed by those persons who are registered with the Attorney General of the United States to do so (with some exceptions, such as delivery persons). The authority to register persons has been delegated to the DEA by the Attorney General.

c.    Title 21 C.F.R. § 1306.4, sets forth the requirements for a valid prescription. It provides that a "prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice [emphasis added]. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

d.    The Chief of Drug Operations of the DEA Office of Diversion Control, Washington, D.C., has stated that acting within the course of professional practice "includes having an established doctor-patient relationship based upon a medical history, a physical exam and diagnosis." Title 21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorized by law.

e.    Based on my training, experience and conversations with other experienced diversion investigators and agents, I know that Title 21 U.S.C. § 841(a)(1) is violated when the physician's authority to prescribe controlled substances is being used not for the treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, or is otherwise issued outside the bounds of the practice of medicine.

9

f.      The Medical Board of California formally adopted a policy statement entitled "Prescribing Controlled Substances for Pain." The Medical Board's guidelines for prescribing a controlled substance for pain states that a medical history and physical examination must be accomplished. This includes an assessment of the pain, physical and psychological function; a substance abuse history; history of prior pain treatment; an assessment of underlying or coexisting diseases and conditions; and documentation of the presence of a recorded indication for the use of a controlled substance. California Business and Professions Code, Section 2242, states that there must be a logical connection between the medical diagnosis and the controlled substance prescribed: "Prescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 without a good faith prior examination and medical indication therefore, constitutes unprofessional conduct." A good faith examination is defined as an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country.

g.      California Business and Professions Code, Section 2241.5(f)(1)(3), Intractable Pain Treatment Act, states that "This section shall not affect the power of the board to deny, revoke, or suspend the license of any physician and surgeon who does any of the following: (1) Prescribes or administers a controlled substance or treatment that is non-therapeutic in nature or non-therapeutic in the manner the controlled substance or treatment is administered or prescribed or is for a non-therapeutic purpose in a non-therapeutic manner; (2) Writes false or fictitious prescriptions for controlled substances listed in the California Controlled Substances Act or scheduled in the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970.

h.      Distribution of a scheduled controlled substance in violation of Title 21 U.S.C. § 841(a)(1) (often referred to as "diversion") by a medical doctor occurs when a medical

doctor knowingly or intentionally prescribes or dispenses a controlled substance, knowing the drugs were controlled, for a purpose other than a legitimate medical purpose within "the usual course of professional practice." See United States v. Moore, 423 U.S. 122, 124 (1975) ("We . . . hold that registered physicians can be prosecuted under 21 U.S.C. § 841when their activities fall outside the usual course of professional practice.").

## THE CONTROLLED SUBSTANCES IN THIS INVESTIGATION

9.      The controlled substances involved in this investigation include the following:

a.      Oxycodone is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance. Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain. It can be habit forming. An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time. Oxycodone is also known by its brand name, Oxycontin, and is a commonly abused controlled substance that is diverted from legitimate medical channels. Oxycodone and Oxycontin are formulated in extended release strengths of 10mg, 20mg, 40 mg, and 80mg per tablet. Oxycodone is also formulated in an oxycodone/acetaminophen combination that is known by the brand name Percocet. Percocet typically has a street value of $1.00-$5.00 per 5mg tablet. Oxycodone typically has a street value of $20.00 to $40.00 per 80mg tablet. Because it is the brand name, Oxycontin typically brings a higher street value.

b.      Hydrocodone is a generic name for a narcotic analgesic classified under federal law as a Schedule III narcotic drug controlled substance. Hydrocodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of mild to moderate pain. Accordingly, the prescription is generally for a modest number of pills to be taken over a short period

11

of time. Hydrocodone is also known by its brand names Vicodin, Norco, and Lortab, and is a commonly abused controlled substance that is diverted from legitimate medical channels. Hydrocodone is formulated in combinations of 5-10mg of hydrocodone and 325-750mg of acetaminophen. Hydrocodone typically has a street value of $1.00 - $3.00 per tablet regardless of strength.

        c.     Fentanyl is a generic name for a semi-synthetic opioid narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance. Fentanyl is a commonly abused controlled substance that is diverted from legitimate medical channels. Fentanyl has been approved for use for anesthesia and analgesia, most often in the operating room and intensive care unit. Fentanyl is often used in cancer therapy and other chronic pain management due to its effectiveness in relieving pain. Fentanyl has an extremely high potential for abuse, addiction, and the development of tolerance.

        d.     Methadone is a generic name for a synthetic opioid narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance. Although chemically unlike oxycodone or heroin, methadone also acts on the opioid receptors and thus produces many of the same effects. Methadone is also used in managing chronic pain due to its long duration of action and very low cost. Methadone's usefulness in treatment of opioid dependence is the result of several factors. It has cross-tolerance with other opioids, including heroin and morphine and a long duration of effect, with the result that oral dosing with methadone will stop the opioid withdrawal syndrome. It also blocks the euphoric effects of heroin, morphine, and similar drugs. As a result, properly dosed methadone patients can reduce or stop altogether their use or abuse of these substances. Methadone typically has a street value of $10.00 per tablet.

12

e.      Buprenorphine is a generic name for a semi-synthetic opioid narcotic analgesic classified under federal law as a Schedule III narcotic drug controlled substance. Depending on the application form, buprenorphine is indicated for the treatment of moderate to severe chronic pain. Buprenorphine sublingual preparations are often used in the management of opioid dependence (that is, dependence on heroin, oxycodone, hydrocodone, morphine, fentanyl or other opioids). Buprenorphine sublingual tablets (Suboxone and Subutex for opioid addiction) have a long duration of action which may allow for dosing every two or three days, as tolerated by the patient, compared with the daily dosing (some patients receive twice daily dosing) required to prevent withdrawals with methadone.

f.      Alprazolam is a generic name for a Schedule IV benzodiazepine prescription drug that, when used for a legitimate medical purpose, is used to treat such conditions as anxiety, depression and panic disorder. Alprazolam is marketed under the brand name Xanax, which is a commonly abused controlled substance that is diverted from legitimate medical channels. Xanax typically has a street value of $1.00 per tablet. A prescription for 100 tablets of alprazolam can earn the street dealer a profit of $100.00 for each bottle of 100 tablets. The dealer's profit multiplies when the dealer obtains several prescriptions at a time for this controlled substance.

## STATEMENT OF PROBABLE CAUSE

In this affidavit, I have used the initials of some individuals instead of their full names, in order to protect their identities.

### Overview of Investigation

10.      HEALY is a medical doctor currently licensed by the State of California and who currently maintains a DEA registration. According to the "Daniel Healy, MD, Online Medical

13

Practice" website, HEALY's specialties are general practice, preventive medicine, weight control, and anti-aging. No indication of a pain management practice is listed on this website or other online doctor websites that reference HEALY's practice. HEALY operates a clinic in Duarte, California (SUBJECT PREMISES-1). The evidence obtained in this investigation indicates that HEALY has prescribed and dispensed large quantities of various highly addictive prescription controlled substances, including oxycodone, suboxone, hydrocodone, and alprazolam, without medical necessity. Significantly, the evidence shows that HEALY is selling the controlled substances to individuals for cash.

**Initiation of Investigation**

11.    In 2006, while investigating a doctor involved in the unlawful prescribing of controlled substances, I noted that "patients" who were receiving controlled substance prescriptions from the doctor under investigation in that case, were also receiving controlled substance prescriptions from Daniel HEALY, M.D. In July 2006, DEA Special Agent ("SA") Frank Bru, acting in an undercover capacity, went to SUBJECT PREMISES-1. After speaking with SA Bru I learned the following:

a.    SA Bru signed in with an unknown receptionist in SUBJECT PREMISES-1. The receptionist asked SA Bru why he was there, and SA Bru told the receptionist that he had pain in his wrist. The receptionist told SA Bru that the doctor was not seeing any pain patients. The receptionist gave SA Bru a list of doctor referrals.

b.    HEALY's office's refusal to see SA Bru as a "pain patient," and my interviews of confidential sources, corroborate the fact that HEALY limits his controlled substance prescribing/dispensing to a trusted group of individuals.

14

12.    In addition to the above information, this investigation was initiated in part on information that HEALY is ordering large quantities of controlled substances. Information provided by multiple confidential sources confirms that HEALY is engaged in dispensing and prescribing addictive pain medications to individuals when doing so is not medically necessary or indicated.

## MEDICAL BOARD INVESTIGATION OF HEALY

### HEALY's Probation with the Medical Board of California

13.    In August 2007, I received a telephone call from Medical Board of California Investigator Thomas Morris regarding Investigator Morris's investigation of HEALY. After speaking with Investigator Morris and reading his reports and other Medical Board of California documents regarding HEALY, I learned the following:

a.    An accusation was filed against HEALY by the Medical Board of California on November 20, 1998. In the first cause for discipline, HEALY was accused of gross negligence in the care of six patients. The accusation states, "Respondent has committed acts or omissions constituting an extreme departure from the standard of medicine in this state." The accusation also alleges the following causes for discipline: incompetence, dishonesty or corruption, fraudulent insurance billings, aiding and abetting unlicensed practice of medicine, conspiracy, and violations of drug statutes. A stipulated settlement and disciplinary order was adopted and became effective on May 26, 2000, placing HEALY's Physician and Surgeon Certificate on probation for four years.

b.    According to the Medical Board of California, another accusation was filed against Healy on March 26, 2002. That accusation alleges the following causes for discipline: gross negligence, incompetence, and unprofessional conduct. A stipulated settlement and disciplinary

order was adopted and became effective on January 3, 2005, placing HEALY's Physician and Surgeon Certificate on probation for three years.

c.    According to the Medical Board of California, HEALY's probation was completed on January 3, 2008.

14.    Investigator Morris also told me the Medical Board of California had received complaints regarding HEALY, specifically about one of HEALY's patients, J.H. Investigator Morris said he received an anonymous complaint that HEALY was prescribing to all the local "drug-seekers." Investigator Morris provided me with a copy of a letter from Dr. M.M., M.D., to the Medical Board of California (dated July 22, 2007) in which Dr. M.M. wrote the following:

a.    "I am a family physician in Whittier, California and I am licensed to additionally prescribe buprenorphine for the outpatient management of opiate withdrawal and dependence. In this capacity, I have recently treated a 23 year-old patient who desires anonymity (J.H.) at the present time but has confided to me that a physician has been supplying him with massive amounts of prescription opiates without a legitimate diagnosis and absolutely no examination. My patient has become addicted to hydrocodone and was taking 40-50 pills daily of Norco 10/325 to ward off opiate withdrawal and keep him functional."

b.    "JH states the doctor he received most of his Norco from was Dr. Daniel Healy in Duarte, California. JH states Dr. Healy would register him as a patient and pay for the office visit, but once in the exam room would ask him what drug and what quantity he wanted. Dr. Healy then dispensed the pills from manufacturer stock bottles given to the patient in exchange for cash. Dr. Healy charged $.50 for Norco and $.40 for Vicodin per pill, and would dispense up to

1000 pills at a visit in bottles with the doctor's name but not the patient name or directions. Dr. Healy would also see JH several times a week if needed."

## MEDICAL BOARD OF CALIFORNIA, DECLARATION OF MARIE RUSSELL, M.D.

15.    In December 2008, Investigator Morris provided me with a copy of a declaration of Marie Russell, M.D. regarding her review of HEALY's prescribing history. After speaking with Investigator Morris and reviewing Dr. Russell's declaration (excerpts are included below), I learned the following:

a.    Dr. Russell is a District Medical Consultant employed by the Medical Board of California, Department of Consumer Affairs, of the State of California. She has been licensed as a physician and surgeon in the State of California for 19 years. She has been employed by the Medical Board of California in the capacity of Medical Consultant since September, 2007.

b.    As a District Medical Consultant, one of Dr, Russell's duties is to review questionable medical and surgical practices of physicians and surgeons licensed by the Medical Board of California. In this regard, it is her responsibility to maintain familiarity with the standard of practice in the State of California.

16.    Dr. Russell states the following in her declaration:

a.    "The Business and Professions Code provides the Medical Board of California with the responsibility of reviewing the quality of medical practice carried out by the physicians and surgeons in California as well as the responsibility for the administration of disciplinary actions for violations of the Business and Professions Code."

17

b.      "The Business and Professions Code also provides various grounds for disciplinary actions against physicians and surgeons which may be imposed by the Board.  These grounds may include, but are not limited to, gross negligence, incompetence, repeated acts of negligence, unprofessional conduct, excessive prescribing or treatment, prescribing to an addict, insurance fraud, and dishonesty or corruptions (Business and Professions Code section 2234, 725, 2241, 810 and 2234).  Good cause exists to believe that violations of the Medical Practice Act may have been committed by Daniel Healy, M.D."

c.      "On August 01, 2007 the Medical Board of California received information form [Dr. M.M.], MD alleging that a 23 year old patient J.H. [full name appears in the original declaration], confided in him that Dr. Daniel Healy had supplied various narcotic medications or controlled substances to him in 'massive quantities' and 'without a legitimate diagnosis and absolutely no examination.'  According to J.H., Dr. Healy 'dispensed the pills from manufacturer stock bottles given to the patient in exchange for cash.  Dr. Healy charged $ .50 for Norco and $ .40 for Vicodin per pill and would dispense up to 1000 pills at a visit.'  Dr. Healy would see J.H. several times per week."

d.      "To determine if a pattern of inappropriate prescribing of medications existed, a Controlled substance Utilization Review and Evaluation System (CURES) report was obtained for the period of Jan. 01, 2004 to Sept. 07, 2007.  The CURES report spanned a period of 1346 days and listed 7079 prescriptions for controlled substances."

e.      "A detailed review of the CURES report indicates multiple instances of the over prescribing of several controlled substances, including HYDROCODONE, OXYCODONE,

18

ANDROGEN (a steroid) and HYDROMET (which contains HYDROCODONE) cough syrup, by Dr. Healy to multiple patients over prolonged periods of time. Many of these patients filled these prescriptions at multiple pharmacies. The patterns of prescribing for many of the patients suggests that patients could be abusing the medications. In some cases, if the medications were consumed by only the patient in the quantities prescribed over the time periods prescribed, in my opinion severe toxicity would have resulted thus strongly suggesting that they were further distributed or sold to others." [Capitalization in original.]

        f.    "Many of the narcotics prescribed by Dr. Healy are produced in combination with acetaminophen (APAP) (more commonly known as Tylenol) which, itself, can lead to severe liver damage or death if consumed in excessive amounts. It is generally recommended that patients not be prescribed greater than 4 grams of APAP daily to avoid toxicity. The amounts of medications prescribed by Dr. Healy frequently would have caused patients to exceed this maximum recommended amount and thus cause a danger to the consumers."

        g.    "The CURES report contains evidence that Dr. Healy prescribed ESCALATING doses or quantities of narcotics over time for some individuals. Additionally, there are instances where Dr. Healy prescribed narcotics to several members of a family SIMULTANEOUSLY and multiple times. Often family members would then utilize different pharmacies to obtain the pills. Also noted was a case of a female patient who was prescribed narcotic containing cough syrup 49 times over the period of 3+ years which she filled at 16 different pharmacies. In prescribing these excessive amounts of narcotics, there is a likelihood that Dr. Healy knew that he was prescribing narcotic to drug addicts." (Capitalized words in original.)

h.    "In another case, the prescribing pattern suggests that a patient became addicted to the narcotics prescribed by Dr. Healy and then received medications from Dr. Healy to treat the addiction."

**HEALY's Controlled Substance Prescribing and Ordering History**

17.    Based on the information described above, I searched various DEA databases and subsequently conducted a query of HEALY's prescribing history with the California Department of Justice - Bureau of Narcotic Enforcement Controlled Substance Utilization Review and Evaluation System ("CURES") program.  The CURES Report is compiled from information maintained in the CURES.  I know from my training and experience that the CURES maintains Schedule II, Schedule III, and Schedule IV prescription information that is received from California pharmacies and is therefore only as accurate as the information provided by the pharmacies.  I reviewed the CURES report and other law enforcement databases that covered calendar year 2008, and I learned the following:

a.    HEALY wrote large quantities of prescriptions for oxycodone and hydrocodone and other controlled substances to numerous individuals.  According to DEA databases, the DEA number registered to HEALY at SUBJECT PREMISES-1 has been used to order the following amounts of hydrocodone over the past five years:



b.       Between January 1, 2008 and December 23, 2008, HEALY ordered 1,013,000 hydrocodone tablets.   According to confidential sources, HEALY sees patients at SUBJECT PREMISES-1 Monday through Wednesday and Friday from 8:00 a.m. to 5:00 p.m. and is closed from 12:00pm to 1:00 p.m. for lunch.   HEALY also sees patients on Saturday at SUBJECT PREMISES-1 from 8:00-1:00 p.m.   This equates to HEALY seeing patients for approximately 162 hours each month or approximately 1,944 hours each year (not excluding holidays or other leave). Based on HEALY's ordering of hydrocodone alone, HEALY would be dispensing approximately 521 hydrocodone tablets every hour HEALY is scheduled to be at SUBJECT PREMISES-1, in addition to writing two controlled substance prescriptions every hour HEALY is scheduled to be at SUBJECT PREMISES-1.  This estimate does not include HEALY'S dispensing of other controlled substances or non-controlled substance prescriptions.  According to DEA databases, HEALY is ranked number one in the United States for practitioners ordering hydrocodone tablets in 2008.  The amount of hydrocodone HEALY orders is exceedingly high.  By way of comparison, I am familiar

21

with a doctor who operates a pain management clinic in the South Bay area of California who did not

order or dispense *any* controlled substances as part of his pain management practice during the same

time periods. Instead, that doctor follows the practice observed by most doctors I have encountered

in my experience and training: he writes prescriptions for controlled substances, and his patients then

fill the prescriptions at pharmacies.

        c.      After reviewing the 2008 CURES report and confirming that sources of

information had in fact received controlled substance prescriptions from HEALY in 2008, I

requested and reviewed the 2005-2007 CURES reports containing the prescribing history for

HEALY between January 1, 2005 and December 31, 2007. I determined that CS-1, who is discussed

below in paragraph 19, received prescriptions for controlled substances from HEALY beginning in

February 2006 through 2007. I also determined that numerous other individuals received similar

controlled substance prescriptions from HEALY in 2006 and 2007.

       18.    A query of DEA databases revealed that HEALY presently maintains a DEA

registration at SUBJECT PREMISES-1.

**Interviews of Confidential Sources**

       19.    Based on the above information concerning HEALY, DEA and other law enforcement

officers, including Monrovia Police Department Detective Richard Doney, interviewed confidential

sources ("CS's") and other sources of information ("SOI's") about HEALY. After participating in

these interviews, reading the reports, and speaking with other law enforcement officers involved, I

learned the information set forth below.

**November 18, 2008 Interview of CS-1**

20.     On November 18, 2008, SA Nomady and I interviewed CS-1. CS-1 first came to

the attention of law enforcement in October 2008, when CS-1's father (a Monrovia, California

resident) contacted Detective Doney at the Monrovia Police Department. CS-1's father wanted

to talk to Detective Doney about CS-1 and CS-3, who were addicted to prescription pills. CS-1's

father told Detective Doney that CS-1 and CS-3 were obtaining pills from HEALY in Duarte.

Det. Doney asked CS-1's father if CS-1 would be willing to talk to Detective Doney about

HEALY. CS-1's father said he was not sure if CS-1 would be willing to talk yet, but CS-3 was

in drug rehabilitation and might want to talk to the police. Several days later, Detective Doney

met with CS-1's mother, CS-1, and CS-3. CS-1 and CS-3 each told Detective Doney that they

had obtained prescription pills from HEALY. Detective Doney asked CS-1 and CS-3 if they

would be willing to talk to DEA about HEALY. CS-1 and CS-3 both agreed to do so. In

November 2008, CS-1 and CS-3 voluntarily went to Monrovia Police Department to meet with

Monrovia Police Department Officers, SA Nomady, and me about HEALY. SA Nomady and I

interviewed CS-1 and CS-3. CS-1 stated that CS-1 had spent time in jail for fraudulent

prescriptions, although my search of criminal databases reveals no criminal history for CS-1.

During SA Nomady's and my interview with CS-1, which took place on November 18, 2008,

CS-1 stated the following:

        a.      CS-1 started taking Vicodin ES in 2004, after surgery on CS-1's right

shoulder. CS-1 received a prescription from a legitimate doctor for 60 tablets. CS-1 did not even

finish the bottle.

b.    CS-1 was friends with B.H., who is the son of Daniel HEALY, M.D. B.H. is approximately 22 years old. CS-1 had been to HEALY's old house in Duarte (493 Fairwood St., Duarte, California) and to HEALY's new house, SUBJECT PREMISES-2.

c.    In the summer of 2005, CS-1 was introduced to HEALY by R.F., whom CS-1 had known since high school and who was CS-1's friend. R.F. told CS-1 that they (R.F. and CS-1) could get whatever they wanted. R.F. went with CS-1 to SUBJECT PREMISES-1.

d.    CS-1 first saw "Dr." A.R. at SUBJECT PREMISES-1. According to confidential sources, "Dr. A.R." is HEALY's physician's assistant. A search of various databases has not revealed a medical professional license for A.R. Thus, although confidential sources refer to him as "doctor," it is not clear that is actually A.R.'s title. When CS-1 first saw A.R. at SUBJECT PREMISES-1, R.F. went into the examination room with CS-1. CS-1 observed that R.F. and A.R. were friendly. A.R. gave CS-1 a brief examination and looked at the scars on CS-1's arm. A.R. asked CS-1 what A.R. could do for CS-1. R.F. told A.R. to give CS-1 some Norco. A.R. said that A.R. would give CS-1 60 tablets. R.F. told A.R. to give CS-1 90 tablets. A.R. said no. A.R. then smiled when A.R. handed CS-1 the prescription, and CS-1 saw that A.R. had written the prescription for 90 tablets. CS-1 paid $65 for the doctor visit, and the pills were separate. At that time, in the summer of 2005, the pills cost $25 for 30 pills. At the time of my interview with CS-1, it was possible, according to CS-1, to buy a sealed bottle of 500 Norco for $400.00.

e.    After CS-1's first visit to SUBJECT PREMISES-1, when CS-1 saw A.R., CS-1 saw only HEALY when CS-1 went to SUBJECT PREMISES-1. CS-1 believes that shortly after CS-1's first visit, A.R. was no longer able to write prescriptions for pain medication.

24

f.        Approximately 2 weeks after CS-1's first visit to SUBJECT PREMISES-1,

CS-1 returned to SUBJECT PREMISES-1. Unlike CS-1's initial visit to SUBJECT PREMISES-1,

in which CS-1 saw A.R. and A.R. gave CS-1 a brief examination, during CS-1's second and

subsequent visits to SUBJECT PREMISES-1, CS-1 saw only HEALY. During CS-1's second and

subsequent visits to SUBJECT PREMISES-1, HEALY would ask CS-1 how CS-1's pain was, and

would then ask CS-1 what CS-1 wanted. HEALY never did an exam of CS-1 or inquire further

about CS-1's pain or medical condition. CS-1 did not need an appointment to see HEALY. CS-1

went to HEALY for about a year and a half after that, until, according to CS-1, things got really

crazy.

g.        SUBJECT PREMISES-1 only has bottles of 30 or 500 pills. HEALY does not

always see patients if HEALY is comfortable with the patients. A regular patient walks in to the

reception area of SUBJECT PREMISES-1 and asks for whatever that patient wants, whether Norco,

Xanax, Soma, or another drug. The receptionist gives the patient the requested drugs. If the

receptionist or other office staff do not recognize or know a person who is requesting drugs, the

receptionist or other office staff will tell the person that: (1) the receptionist or other office staff do

not know the person, (2) HEALY does not do pain management, and (3) HEALY does not accept

any new patients. However, CS-1 knows a person who went to SUBJECT PREMISES-1 and told

the receptionist that the person was at SUBJECT PREMISES-1 for weight management. After a few

visits, that person was able to get whatever drugs that person wanted.

h.        HEALY owns the entire building at 1755 E. Huntington in Duarte, California,

in which SUBJECT PREMISES-1 is located at Suite 104. Other than Suite 104, which is SUBJECT

PREMISES-1, HEALY leases out the offices in the building. There were times when CS-1 went to SUBJECT PREMISES-1 to buy drugs and HEALY seemed stricter. On those occasions, HEALY spoke with CS-1 about reducing the amount of opiates CS-1 was taking. HEALY suggested that CS-1 take suboxone but because HEALY charged $10 per pill for suboxone, it was a lot cheaper for CS-1 to take the opiates. There was a time when HEALY talked to CS-1's friends and asked if any of CS-1's friends were selling the drugs. HEALY recently put up two signs that said he would only accept cash and would not accept insurance.

      i.     In August 2006, CS-1's parents learned of CS-1's addiction to opiates. CS-1's dad went to SUBJECT PREMISES-1 and lectured HEALY about HEALY dispensing opiates. After that, HEALY stopped dispensing to CS-1 and CS-1's friends, which continued for approximately one month. CS-1 has not been back to SUBJECT PREMISES-1 for more than a year. CS-1 has been purchasing Norco from CS-1's friends. CS-1 was getting 120 Norco from HEALY twice per week. CS-1 knows people who are getting 2,000 to 3,000 Norco per week. Because HEALY dispenses right from SUBJECT PREMISES-1, there are no prescriptions.

      j.     Approximately 6 months ago, CS-1's friend went to HEALY at SUBJECT PREMISES-1. CS-1's friend told the receptionist at SUBJECT PREMISES-1 that CS-1's friend had menstrual cramps so CS-1's friend would not get turned away. When CS-1's friend got into the examination room, CS-1's friend told HEALY that CS-1's friend needed Norco. HEALY gave CS-1's friend a prescription for 30 tablets on the first visit, and another for 120 tablets the following week. CS-1's friend went back several times, and then the receptionist at SUBJECT PREMISES-1 told CS-1's friend that CS-1's friend could not come back to SUBJECT PREMISES-1.

k.      HEALY dated and lived with one A.C., who was one of the people who worked at SUBJECT PREMISES-1. CS-4 was the primary receptionist, and CS-4 had been there from the beginning. If a customer was nice to CS-4, CS-4 would fill the customer's order quickly. If CS-4 did not like a customer, CS-4would turn that person away.

l.      HEALY originally had a form that had a list of symptoms, and HEALY would check off the symptoms and then write on the bottom of the sheet the number of bottles to be dispensed. CS-1 said that CS-1 would then take the form to CS-4, who would give CS-1 the bottles. CS-1 said CS-1 received a copy of the form.

m.      CS-1's best friend was at a nine-month in-patient drug rehabilitation in Long Beach. CS-1 said that CS-1's friend is seriously addicted to opiates, and CS-1 blames HEALY. CS-1's friend went to SUBJECT PREMISES-1 initially and got turned down, but returned a year later and HEALY gave him (CS-1's best friend) whatever he (CS-1's best friend) wanted. CS-1's best friend was quickly addicted.

n.      At one time, CS-1 was taking 50 Norco and four Xanax per day and CS-1's friend A.A. was taking 20 Norco and four Xanax per day. A.A. went through a five-day drug detoxification program, while CS-1 was quitting without medical supervision.

o.      A lot of the patients are friends of HEALY's older son, J.H. (a different person than the J.H. referenced earlier in this affidavit.) HEALY's older son J.H. is approximately 23 years old. CS-1 knows at least ten of CS-1's friends who are now addicts as a result of going to HEALY. CS-1 believes that CS-1's friends who have gone to HEALY at SUBJECT PREMISES-1 may have had injuries at one time, but are now addicted to opiates and are victims of HEALY. CS-1 believes

most of the patients who are regular patients of HEALY and are addicted to opiates are also friends

of HEALY's sons B.H. and J.H.

      p.    CS-1 knows a girl with whom CS-1 works. The girl went to HEALY and is

now taking Suboxone. CS-1 knows at least three people who are currently getting 60 tablets of

Oxycontin per month in the 80 mg dose from HEALY.

      q.    SUBJECT PREMISES-1 is open every day except Thursdays and Sundays,

and sometimes half-days on Fridays. At SUBJECT PREMISES-1, HEALY and/or the office staff of

SUBJECT PREMISES-1 dispense virtually any drug.

**November 18, 2008 Interview of CS-2**

    21.    On November 18, 2008, SA Nomady and I interviewed CS-2. CS-2 had come to the

attention of law enforcement on November 11, 2008. On that day, Detective Doney was contacted

by his partner Detective Perenishko, who was working patrol overtime. Detective Perenishko told

Detective Doney that CS-2 was arrested along with two friends of CS-2's. CS-2 and CS-2's two

friends were in a parked car smoking marijuana. Detective Perenishko also found 16 Hydrocodone

pills and 1 ½ Xanax pills in the car with CS-2 and CS-2's friends. Detective Perenishko arrested CS-

2 and CS-2's friends and brought CS-2 and CS-2's friends to the Monrovia Police Department.

Detective Perenishko contacted Detective Doney, who went to the Monrovia Police Department.

When Detective Doney got to the Monrovia Police Department, Detective Doney talked with CS-2

about the pills and CS-2's arrest. Detective Doney asked CS-2 if CS-2 would be willing to work for

Detective Doney in return for consideration from law enforcement in the case arising from CS-2's

arrest in the car with CS-2's friends. CS-2 agreed to work with Detective Doney for consideration in

his case. After speaking with Detective Doney, CS-2 and CS-2's friends were all released pending

further investigation. In addition, Detective Doney learned from CS-1 and CS-3 that CS-2 was a

heavy user of prescription pills. CS-1 and CS-3 told Detective Doney to talk to CS-2 and predicted

that CS-2 would provide law enforcement with a lot of information on HEALY. CS-2 sustained two

arrests in 2007 for driving under the influence of alcohol and/or drugs, a 2008 arrest for possession

of marijuana, and a 2008 arrest for being under the influence of a controlled substance. On

November 18, 2008, CS-2 went to Monrovia Police Department to meet with Monrovia Police

Department Officers, SA Nomady, and me about HEALY. During SA Nomady's and my interview

with CS-2 on November 18, 2008, CS-2 stated the following:

       a.     CS-2 started taking Vicodin ES in the 9th grade, approximately 6 years prior.

CS-2 said CS-2 heard about HEALY. CS-2 knew that HEALY was selling pills to M.M. M.M. was

selling them to another person in CS-2's high school, and that person was selling them to CS-2.

       b.     CS-2 took the Vicodin ES for a couple of years, and then CS-2 started using

Norco. CS-2 has been using Norco ever since. CS-2 was paying $3.00 per pill in the beginning for

the Vicodin ES.

       c.     CS-2 has never been inside SUBJECT PREMISES-1 to see HEALY. CS-2

has been in the car with other people when those people have gone to pick up drugs at SUBJECT

PREMISES-1. CS-2 bought pills from numerous friends, and CS-2 understood that the original

source of those pills was HEALY. CS-2 never went to HEALY because CS-2's friends told CS-2

that HEALY would not see any new patients. CS-2's friends were paying 88 cents per pill. CS-2

knew at least five people who were getting pills from HEALY.

d.    When CS-2 first started using prescription drugs, CS-2 was taking three Vicodin ES a day.  At the time of CS-2's interview, CS-2 was taking approximately 10 Norco per day.  CS-2 works all day, and when CS-2 gets home from work, CS-2 takes all 10 Norco at once.  At CS-2's worst point, CS-2 was taking 20 Norco per day.

e.    CS-2 was also getting Oxycontin tablets in the 80 mg dose from CS-2's friends.  CS-2 understood that CS-2's friends were getting the Oxycontin pills from HEALY.  CS-2's friends paid $5.00 for 60 tablets at SUBJECT PREMISES-1 if CS-2's friends had insurance.  CS-2 would then pay $25.00 to $40.00 for one Oxycontin tablet.  CS-2 also got Suboxone from CS-2's friends, which CS-2 understood came from HEALY.  CS-2's friends gave the Suboxone to CS-2 for free.

f.    CS-2's friends D.R. and A.P. got Oxycontin from HEALY at SUBJECT PREMISES-1.  A.P. used at least two different last names in order to obtain more prescriptions.  HEALY will give D.R. and A.P. Oxycontin only one time per month.  D.R. and A.P. are both addicts, and they each take 6 to 8 Oxycontin per day.  D.R. picks up 1500 Norco at a time from HEALY at SUBJECT PREMISES-1.

g.    HEALY is at SUBJECT PREMISES-1 on Monday, Wednesday, Friday, and Saturday.  A.R. is at SUBJECT PREMISES-1 on the other days of the week, and A.R. refuses to sell drugs to D.R. and A.P.  CS-2 believes that A.R. and the office staff and nurses know that drugs are being distributed at SUBJECT PREMISES-1.

h.    D.R. and A.P. used to go to SUBJECT PREMISES-1 every day HEALY was scheduled to work at SUBJECT PREMISES-1, but now D.R. goes once or twice a week and A.P.

30

goes three times a week. D.R. and A.P. do not go to SUBJECT PREMISES-1 as often as they once

did, because they now obtain a much higher quantity of drugs per visit to SUBJECT PREMISES-1.

      i.     Of CS-2's friends, D.R., A.P., and M.M. buy the most narcotics, sell the most

narcotics, and take the most narcotics. As far as CS-2 knows, D.R., A.P., and M.M. get all of their

narcotics from HEALY. Neither D.R., nor A.P., nor M.M. has any medical issues known to CS-2.

**November 19, 2008 Interview of CS-3**

    22.    On November 19, 2008, SA Nomady and I interviewed CS-3. CS-3 had come to the

attention of law enforcement in October 2008, when CS-1's father (a Monrovia, California resident)

contacted Detective Doney at the Monrovia Police Department. CS-1's father wanted to talk to

Detective Doney about CS-1 and CS-3, who were addicted to prescription pills. CS-1's father told

Detective Doney that CS-1 and CS-3 were obtaining pills from HEALY in Duarte. Detective Doney

asked CS-1's father if CS-1 would be willing to talk to Detective Doney about HEALY. CS-1's

father said he was not sure if CS-1 would be willing to talk yet, but CS-3 was in drug rehabilitation

and might want to talk to the police. Several days later, Detective Doney met with CS-1's mother,

CS-1, and CS-3. CS-1 and CS-3 each told Detective Doney that they had obtained prescription pills

from HEALY. Detective Doney asked CS-1 and CS-3 if they would be willing to talk to DEA about

HEALY. CS-1 and CS-3 both agreed to do so. In November 2008, CS-1 and CS-3 voluntarily went

to Monrovia Police Department to meet with Monrovia Police Department Officers, SA Nomady,

and me about HEALY. SA Nomady and I interviewed CS-1 and CS-3. According to my search of

law enforcement criminal history databases, CS-3 has no criminal history. During SA Nomady's and

my interview with CS-3, which took place on November 19, 2008, CS-3 stated the following:

31

a.      CS-3 heard about HEALY four to five years ago from CS-3's friends, who were going to HEALY at SUBJECT PREMISES-1 to get pharmaceuticals. Once word got out that drugs were available at SUBJECT PREMISES-1, many other people began to see HEALY.

b.      In March 2008, CS-3 tried for the first time to go see HEALY at SUBJECT PREMISES-1, despite the fact that CS-3's friends had told CS-3 that HEALY was not taking any new patients. CS-3 called SUBJECT PREMISES-1 before CS-3 went to make an appointment at SUBJECT PREMISES-1. On the telephone, CS-3 talked to CS-4. CS-4 told CS-3 to just come in to SUBJECT PREMISES-1 and that transactions at SUBJECT PREMISES-1 were cash only.

c.      When CS-3 went into SUBJECT PREMISES-1, CS-3 saw CS-4. CS-4 asked CS-3 if CS-3 was a new patient. CS-4 asked CS-3 why CS-3 was at SUBJECT PREMISES-1. CS-3 told CS-4 that CS-3 needed birth control pills. CS-3 said CS-3 needed birth control pills because CS-3's friends had warned CS-3 not to say that CS-3 was at SUBJECT PREMISES-1 for pain. CS-4 called CS-3 back into a room within SUBJECT PREMISES-1. CS-4 told CS-3 to sit on a chair, and CS-4 left the room. HEALY then came into the room in which CS-3 was waiting. When HEALY came into the room, HEALY did not look at CS-3 or speak. CS-3 told HEALY that CS-3 needed birth control pills and was having menstrual cramps. CS-3 told HEALY that CS-3 needed a really strong pain reliever that did not have much Tylenol (acetaminophen) in it. HEALY wrote CS-3 a prescription for 30 Norco tablets in the 10 mg dose.

d.      CS-3 went back to SUBJECT PREMISES-1 less than a week later, and told HEALY that CS-3 was still having cramps and needed a prescription for 120 Norco. HEALY asked CS-3 if that was it, and then agreed to give CS-3 the Norco CS-3 asked for.

32

e.      The next time CS-3 went back to SUBJECT PREMISES-1, CS-4 told CS-3 that HEALY and the office staff in SUBJECT PREMISES-1 were not seeing pain patients. CS-4 gave CS-3 a list of doctors that CS-3 could contact.

f.      At no time did HEALY examine CS-3 or take CS-3's medical history. CS-3 paid $65 for each office visit at SUBJECT PREMISES-1, and CS-3 paid $10 for Norco at a pharmacy, because CS-3 had insurance.

g.      CS-3 had information on other people who CS-3 believed to be patients of HEALY. A.S. was doing pills and cocaine. D.R. was going perhaps three times a week to SUBJECT PREMISES-1 and was getting 4,000 Norco each time. D.R. usually goes to SUBJECT PREMISES-1 on Mondays, Wednesdays, and Fridays. D.R. got D.R.'s significant other, D.V., into HEALY through HEALY's Diet Program. D.R. spent around $400.00 for the Diet Program. CS-3 believes that when HEALY has a connection with a person, HEALY will give that person whatever that person asks for. When D.R. went into SUBJECT PREMISES-1, HEALY let D.R. pick up Norco for both D.R and D.V. CS-3 heard that D.V. had stopped taking Norco, but D.R. was still picking Norco up for D.V. at SUBJECT PREMISES-1.

h.      CS-3 was taking eight Norco per day. The most Norco CS-3 ever took in one day was at least 32 Norco. On that occasion, A.L. gave CS-3 an Oxycontin 80 mg that CS-3 took orally, another Oxycontin 80 mg that CS-3 snorted, and three Xanax.

i.      The last time CS-3 went to SUBJECT PREMISES-1 to see HEALY was in March, 2008. It costs $65.00 for an office visit at SUBJECT PREMISES-1, regardless of the reason

for the visit. A.L., however, does not even pay for office visits at SUBJECT PREMISES-1 anymore; A.L. pays only for the narcotics.

        j.    The office staff at SUBJECT PREMISES-1 generally gives patients the narcotics in a white plastic bag, with a receipt. For a sealed manufacturer's bottle of 500 Norco, HEALY charges $400.00. The bottles have cheap labels, like mailing labels, that contain the patient's name and instructions to take one pill every four hours. HEALY does not require any identification from patients who come into SUBJECT PREMISES-1 to buy narcotics. HEALY and the office staff at SUBJECT PREMISES-1 no longer take insurance or credit cards. HEALY does keep patient files, and HEALY appears to write in a patient's file when he sees that patient.

        k.    CS-3 believes HEALY also uses narcotics. CS-3 also believes that HEALY's son B.H. told CS-1 that HEALY used narcotics.

**December 18, 2008 Interview of CS-4**

      23.    In December 2008, CS-4 and CS-5 voluntarily went to the Temple City Sheriff's Station in Duarte, California to advise law enforcement officers that CS-4 and CS-5 had come to report HEALY. Duarte law enforcement officers referred CS-4 and CS-5 to the Monrovia Police Department. On December 18, 2008, CS-4 and CS-5 voluntarily went to the Monrovia Police Department ("MPD") after speaking with Detective Doney, who invited CS-4 and CS-5 to come to the MPD to speak with law enforcement about HEALY. According to a search of law enforcement criminal history databases, CS-4 has no criminal history. On December 18, 2008, SA Nomady and I interviewed CS-4 and CS-5 at the MPD, along with Detective Doney and other law enforcement officers. During SA Nomady's and my interview with CS-4, CS-4 stated the following:

34

a.    CS-4 had worked at SUBJECT PREMISES-1 for 6½ years, in the front office of SUBJECT PREMISES-1. CS-4's responsibilities at SUBJECT PREMISES-1 included acting as a receptionist, assisting with medical records, and counting pills. CS-4 described HEALY's practice as consisting of a general practice, like an urgent care facility, and weight loss.

b.    HEALY received pills from Harvard Drug Group and Masters (another pharmaceutical company) in large bottles, usually consisting of 500 pills. It was the responsibility of CS-4 and the other office staff at SUBJECT PREMISES-1 to count the pills out into smaller bottles containing 30 pills each. CS-4 and the other office staff conducted this counting process for all of the medications at SUBJECT PREMISES-1, including weight loss pills, antibiotics, and narcotics.

c.    CS-4 identified other employees who worked in SUBJECT PREMISES-1, including CS-5, who worked for 4½ years at SUBJECT PREMISES-1 before quitting. CS-4 worked together with CS-5 for two years with CS-5. CS-4 identified A.C. as the office manager at SUBJECT PREMISES-1. CS-4 also identified A.C. as HEALY's live-in girlfriend.

d.    A patient comes into SUBJECT PREMISES-1 and fills out a request form for the drugs that patient wants. CS-4 or another office employee at SUBJECT PREMISES-1 gives the patient's request form to HEALY. HEALY initials or signs the patient's request form and gives the form back to CS-4 or the other office employees at SUBJECT PREMISES-1. HEALY then dispenses the drugs by giving the drugs to CS-4 or another office employee at SUBJECT PREMISES-1. CS-4 or another office employee at SUBJECT PREMISES-1 verifies the drugs to make sure the drugs dispensed by HEALY match the request on the patient's form. CS-4 or another

35

office employee at SUBJECT PREMISES-1 inputs the patient's request into a computer at SUBJECT PREMISES-1, and collects the money from the patient.

      e.     The procedure for dispensing drugs at SUBJECT PREMISES-1 is similar to a normal doctor's office, except for the large quantities HEALY gives out. HEALY dispenses primarily Norco, Lorcet, Lortab, Vicodin, and Soma. Most of HEALY's patients come into SUBJECT PREMISES-1 for narcotics.

      f.     There is a room in SUBJECT PREMISES-1 that contains all of the medications in SUBJECT PREMISES-1. In that room, cupboards separate the different types of medications. Diet medications are in one cabinet, antibiotics are in another cabinet, and all of the narcotics are in a third cabinet. CS-4 or the other office employees dispense the diet medications, but only HEALY dispenses antibiotics and narcotics.

      g.     CS-4 believes that HEALY dispenses too many narcotics. HEALY has patients who come into SUBJECT PREMISES-1 and purchase 360 Norco per day. HEALY also has patients who come into SUBJECT PREMISES-1 and purchase two 500-count manufacturer's bottles of Norco at a time. HEALY also has patients who come into SUBJECT PREMISES-1 for cough medication (6.25 mg. promethazine/10 mg. codeine) and HEALY distributes the 16-ounce bottles of this cough medication. At one time, SUBJECT PREMISES-1 had only the 4-ounce bottles of this cough medication, which were for patients who had a cough or were sick.

      h.     HEALY and A.C., who is HEALY's office manager and live-in girlfriend, order all of the narcotics at SUBJECT PREMISES-1. Office employees at SUBJECT PREMISES-1 other than A.C. have gotten into trouble with A.C. if the other office employees at SUBJECT

36

PREMISES-1 tell patients that the patients have been to SUBJECT PREMISES-1 recently and do not need any more medication. Office employees at SUBJECT PREMISES-1 other than A.C. have gotten into trouble with A.C. if the other office employees at SUBJECT PREMISES-1 tell patients that the patients  should wait a week or two before obtaining more medication. A.C. has told the other office employees at SUBJECT PREMISES-1 not to question the patients, and to just take the patients' requests and leave it to the doctor.

i.     When a patient comes to the reception window at SUBJECT PREMISES-1, the patient will request, for example, 120 or 240 Norco. At one time, HEALY would have required that he (HEALY) see the patient prior to HEALY dispensing the medication. Then, all of the sudden, the requirement that HEALY see the patient prior to dispensing the drugs, stopped. A large number of patients now come into SUBJECT PREMISES-1 and simply order whatever they want. A patient now writes on the request form the amount of drugs the patient is requesting, and HEALY just brings the narcotics out to the front desk without ever examining the patient. HEALY recently started making labels for the bottles of narcotics, and the labels have the patients' names on them.

j.     The office at SUBJECT PREMISES-1 has changed a lot in the six years CS-4 has worked at SUBJECT PREMISES-1. In the beginning, there were a few patients who appeared to be addicted. Now, most of HEALY's patients come to SUBJECT PREMISES-1 for narcotics.

k.     SUBJECT PREMISES-1 was robbed on December 17, 2008, the day before CS-4's interview at the MPD. CS-4 believed SUBJECT PREMISES-1 was robbed because HEALY's patients know there is a large amount of cash that comes into SUBJECT PREMISES-1. On an average day HEALY makes $3,000 to $6,000 in cash at SUBJECT PREMISES-1, and almost

all of that money comes from narcotics. Every day, an office employee of HEALY's at SUBJECT

PREMISES-1 makes a cash deposit at the Bank of America down the street from SUBJECT

PREMISES-1. On the day of the robbery, the robbers took approximately $4,000 from SUBJECT

PREMISES-1. CS-4 believed $1,000 was from the day of the robbery, and $3,000 was from the

previous day. During the week of the robbery, SUBJECT PREMISES-1 had been slow. The robbers

took HEALY's personal computer.

        l.    CS-4 occasionally arrives at SUBJECT PREMISES-1 10 or 15 minutes early

in the morning. On one or more occasions, CS-4 has seen a white male with spiked blond hair

coming out the back door of SUBJECT PREMISES-1 with a bag that the man put in the trunk of a

car. The man with spiked blond hair had been a prior patient of HEALY's. When the man with the

spiked blond hair was a patient of HEALY's the man would come into SUBJECT PREMISES-1 and

buy large quantities of narcotics. Then the man with the spiked blond hair stopped coming to

SUBJECT PREMISES-1. To CS-4, it was very suspicious that HEALY was seeing the man with the

spiked blond hair at SUBJECT PREMISES-1 outside of normal office hours.

        m.    CS-4 knew, and it was obvious to CS-4, that the patients coming into

SUBJECT PREMISES-1 were there to abuse drugs and not because they were sick. Patients who

were 20 years old came into SUBJECT PREMISES-1 and said they had back problems, but it was

apparent to CS-4 that there was nothing wrong with those patients. The situation at SUBJECT

PREMISES-1 had gotten a lot worse in the last year, and HEALY was now dispensing Oxycontin,

morphine, and Demerol. In the last couple of months, it had gotten crazy at SUBJECT PREMISES-

1. CS-4 believed the reason for the craziness at SUBJECT PREMISES-1 was money. CS-4 believed HEALY was all about the money.

n.     HEALY has been separated from his wife for a few years and now lives with his paramour A.C., who is also HEALY's office manager. A.C. has been separated from A.C.'s spouse for two years. Office employees at SUBJECT PREMISES-1 had caught HEALY and A.C. having an affair at SUBJECT PREMISES-1.

o.     On numerous occasions, patients would come to SUBJECT PREMISES-1 and ask to talk to HEALY. On these occasions, HEALY would take the patient back into an examination room at SUBJECT PREMISES-1 and then bring the patient a box of medication. CS-4 believed the patient would give HEALY money and HEALY would keep the money himself. The patient would then leave SUBJECT PREMISES-1. During these transactions, there would be no paperwork and no information would be entered into a computer at SUBJECT PREMISES-1. CS-4 would ask HEALY if HEALY wanted CS-4 to enter these transactions into a computer. HEALY would tell CS-4 not to enter the transactions into a computer.

p.     CS-4 reported HEALY to law enforcement because the situation at SUBJECT PREMISES-1 had gotten really out of hand. CS-4 and CS-4's co-workers had tried to talk to HEALY and tell HEALY that many of HEALY's patients did not need the narcotics HEALY was selling them. CS-4 tried to hold out as long as CS-4 could, to give HEALY the benefit of the doubt, but the situation at SUBJECT PREMISES-1 had gotten really bad in the last year. HEALY joked about the situation; CS-4 would tell HEALY that a patient was at SUBJECT PREMISES-1 for cough syrup, and HEALY would ask if the patient wanted the "family size" or the "party size."

q.    CS-4 does not have any special training and has not worked with any other doctors besides HEALY.  After six years of working at SUBJECT PREMISES-1, CS-4 has a good sense of right and wrong.  CS-4 believes it is wrong to hand patients boxes of narcotics in the rooms in SUBJECT PREMISES-1.

r.    Patients called SUBJECT PREMISES-1 and reported that they (the patients) had been stopped by police.  HEALY began "freaking out."  HEALY began telling patients that HEALY was not going to give the patients the full quantity the patients requested, because HEALY was being watched.  After several days, HEALY asked CS-4 if patients were still calling SUBJECT PREMISES-1 and if SUBJECT PREMISES-1 and HEALY were still being watched.  At least four or five patients had called HEALY to tell HEALY that they (the patients) had been pulled over by the police.

s.    What really irritates CS-4 is that some of the patients who come into SUBJECT PREMISES-1 can barely stand up, but HEALY still gives the patients more narcotics.  CS-4 and CS-4's co-workers tell HEALY to deny these patients' requests for narcotics, to tell the patients no, but HEALY responds that it is ok.  CS-4 believes HEALY acts this way because HEALY is all about the money.  HEALY does not give his employees raises and his employees have to beg to get paid on holidays.

t.    HEALY has almost the same percentage of weight loss and narcotics-seeking patients.  But when CS-4 asked HEALY if the economy was going to hurt business at SUBJECT PREMISES-1, HEALY responded that as long as loyal narcotics customers continued to come to SUBJECT PREMISES-1, the business would be ok.  CS-4 believed most of the money coming into

SUBJECT PREMISES-1 came from the narcotics patients. Weight-loss patients came in once a week and paid $48.00. Approximately 60 patients would come to SUBJECT PREMISES-1 every working day. Narcotics patients would usually come in first thing in the morning or first thing right after lunch.

u.    Approximately 20 narcotics patients regularly come to SUBJECT PREMISES-1, and they often call SUBJECT PREMISES-1 to see if drug shipments have arrived. CS-4 feels like CS-4 is a drug dealer because CS-4 takes money from patients and gives them the medications. CS-4 knows in her mind that what CS-4 does at SUBJECT PREMISES-1 is wrong.

v.    CS-4 believes patients have died because of medications the patients have received from HEALY, but HEALY has never been found to be at fault. One patient, M.D., committed suicide a week or two prior to CS-4's interview; M.D.'s spouse called CS-4 and yelled at CS-4. M.D.'s spouse told CS-4 that M.D. committed suicide only because of the medication. Two other patients also passed away approximately three years ago, which CS-4 believed to be the result of taking too many narcotics. CS-4 asked HEALY about those deaths, and HEALY said the dead patients were used to taking a large quantity of narcotics and narcotics should not have caused their deaths. Whenever a person takes a large amount of medication for several years, the person's liver and other organs start to have problems. One of the patients died in his sleep after taking narcotics.

w.    HEALY does not take insurance because insurance companies do not pay 100% of claims, and patients never pay their share. Starting in January 2009, HEALY will only accept cash.

41

x.      HEALY charges $25.00 for 30 tablets of either Vicodin or Norco. HEALY charges $15.00 for 30 tablets of 2 mg. Xanax. HEALY charges $20.00 for 30 tablets of Lortab. HEALY charges $15.00 for 30 tablets of Lorcet. HEALY charges $30.00 for 30 tablets of Percocet. HEALY just started carrying Oxycontin, fentanyl, and Percocet in the last month. Prior to that, HEALY had perhaps three patients who received prescriptions for Oxycontin. In the month prior to CS-4's interview, HEALY started selling Oxycontin.

y.      CS-4 believes HEALY's source for medications is possibly being watched, because SUBJECT PREMISES-1 used to get large shipments of narcotics once a week. Now the shipments coming into SUBJECT PREMISES-1 are more limited and SUBJECT PREMISES-1 is getting a smaller number of bottles each day.

z.      CS-4 knows that none of HEALY's regular narcotics patients are legitimate because if HEALY is on vacation, the patients will ask CS-4 what they are supposed to do because they (the patients) are addicts and will have severe withdrawal symptoms.

aa.      When a patient comes into SUBJECT PREMISES-1, the patient comes up to the front desk and says that he or she wants to put in a request. CS-4 gives the patient a request form and gets the patient's name and date of birth, as well as the type and quantity of medication the patient seeks. CS-4 then gives the request form to HEALY, and HEALY pulls the medication out from the back room of SUBJECT PREMISES-1. HEALY signs or initials the patient's request form. CS-4 calls the patient back to the counter, and confirms that the amount of medication matches the patient's request form. CS-4 inputs the information into a computer, and gives the patient a handwritten receipt as well as the receipt from a computer. In this way, there is a record kept of

everything except the large quantities of narcotics HEALY gives to patients outside of normal office

visits at SUBJECT PREMISES-1, in which CS-4 believes HEALY just pockets the cash. HEALY is

supposed to do an inventory of the narcotics in SUBJECT PREMISES-1, but CS-4 does not believe

HEALY does so.

        bb.    CS-4 does not believe that HEALY ever examines the patients that come to

SUBJECT PREMISES-1 anymore. Roughly half of the patients that come into SUBJECT

PREMISES-1 now have not been going into an examination room for a long time, perhaps as long as

a year or more. If a patient needs an actual written prescription from HEALY because, for example,

SUBJECT PREMISES-1 is out of a drug, the patient goes into an examination room within

SUBJECT PREMISES-1 and HEALY charges the patient $65.00 for the office visit. The patient is

in the examination room with HEALY for just a few minutes, and CS-4 does not believe HEALY

conducts an examination.

        cc.    Pharmacies know what HEALY is doing, including the Target pharmacy in

Duarte, California, which will not fill prescriptions written by HEALY, including those for cough

syrup. That pharmacy will not fill any prescriptions for narcotics written by HEALY.

        dd.    HEALY stopped seeing new patients for pain at least a year ago. CS-4

believes this is because HEALY was trying to be more careful. HEALY recently started accepting

new patients. HEALY told CS-4 that HEALY would talk to the new patients first, and if there was a

legitimate reason for the patient to be at SUBJECT PREMISES-1, HEALY would give the patients

the benefit of the doubt.

ee.    When pills come into SUBJECT PREMISES-1, A.C. will inventory the pills and then tell one of the receptionists at SUBJECT PREMISES-1 to count the pills out into bottles.

ff.    A.R. is a Physician's Assistant at SUBJECT PREMISES-1, and A.R. works primarily at the diet clinic part of SUBJECT PREMISES-1.  A.R. tries to turn away HEALY's narcotics-seeking patients when HEALY is not at SUBJECT PREMISES-1, but A.C. gets mad at A.R. and tells HEALY, who then admonishes A.R.

gg.    HEALY has a clinic in Rancho Cucamonga, California, which is strictly for HEALY's weight-loss patients. HEALY has also purchased three or four other diet clinics in San Diego, California, which is where HEALY is on Thursdays. HEALY has Physician's Assistants who work at HEALY's various clinics when HEALY is not at that particular clinic.

hh.    Some of HEALY's worst narcotics patients include A.L., M.M., D.N., L.B., R.F., and D.G.  These patients received from 120 to 360 Norco, as well as Xanax, on a daily basis.

ii.    HEALY keeps Schedule II drugs in his office within SUBJECT PREMISES-1.  CS-4 does not believe HEALY uses drugs other than injections of human growth hormone.

jj.    HEALY drives a black Mercedes-Benz and has four children.  HEALY lives with A.C. and A.C.'s two children.  HEALY got his three sons an apartment and HEALY's three sons live together.  HEALY's daughter is attending medical school in Chicago, Illinois.

kk.    At the end of each working day, CS-4 totals up the money that has come into SUBJECT PREMISES-1 that day and gives HEALY the money. HEALY usually puts the money in a drawer in SUBJECT PREMISES-1. Typically, the next day A.C. goes to the bank and deposits the

44

money from the prior day. CS-4 believes that A.C. knows what HEALY is doing and knows it is wrong, but A.C. and HEALY are both all about the money.

       ll.     A.C. orders the drugs that come into SUBJECT PREMISES-1. A.C. negotiates with drug companies to try to obtain more medication for HEALY at SUBJECT PREMISES-1. A.C. has asked pharmaceutical distributors how HEALY can obtain more pharmaceuticals at SUBJECT PREMISES-1. A.C. gets angry when CS-4 or other office employees at SUBJECT PREMISES-1 question patients' need for narcotics or turn patients away.

**January 13, 2009 interview of CS-4**

      24.    On January 13, 2009, SA Nomady and I interviewed CS-4 outside CS-4's home. CS-4 stated the following:

       a.     At SUBJECT PREMISES-1, HEALY has computers, a server, and some kind of system that backs up the data in the computers.

       b.     CS-4 inputs patient information into a computer at SUBJECT PREMISES-1, including dates of visits and medications received by patients. This information is taken from the request forms HEALY's patients fill out when the patients arrive at SUBJECT PREMISES-1. After CS-4 or another office employee enters the information into a computer at SUBJECT PREMISES-1, the patient receives a copy of the receipt and the information is shredded. A computer at SUBJECT PREMISES-1 failed about a year ago and HEALY brought people in to fix it. Some patient information is in paper form at SUBJECT PREMISES-1, but only because the office employees at SUBJECT PREMISES-1 are behind on inputting the information into the computers at SUBJECT PREMISES-1. Individuals whom HEALY sees outside of normal office hours at SUBJECT

45

PREMISES-1 are not inputted into a computer at SUBJECT PREMISES-1. CS-4 believes these

patients pay cash directly to HEALY and there are no records kept of these transactions.

**December 18, 2008 Interview of CS-5**

25.    On December 18, 2008, CS-4 and CS-5 voluntarily went to the MPD to speak with

law enforcement about HEALY. According to a search of law enforcement criminal history

databases, CS-5 has no criminal history. SA Nomady and I interviewed CS-4 and CS-5 at the MPD,

along with Detective Doney and other law enforcement officers from the MPD. During SA

Nomady's and my interview with CS-5, CS-5 stated the following:

a.    CS-5 was at the MPD along with CS-4 to report HEALY, the doctor for whom

CS-4 works and for whom CS-5 used to work. CS-5 began working for HEALY at SUBJECT

PREMISES-1 as a volunteer, when SUBJECT PREMISES-1 was primarily a diet clinic. CS-5

started working for HEALY in the front office of SUBJECT PREMISES-1 as a paid employee when

CS-5 turned 16 years old. When HEALY divorced HEALY's wife K.H., CS-5 started working at

SUBJECT PREMISES-1 full time. When HEALY's new office manager at SUBJECT PREMISES-

1, A.C., started in 2000 or 2001, everything changed. Once A.C. started at SUBJECT PREMISES-1,

A.C. started pushing herself on HEALY - even though HEALY and A.C. were each married to other

people - until HEALY and A.C. eventually had an affair. Everything went downhill after HEALY

and A.C.'s affair began; HEALY divorced HEALY's wife K.H., and fired HEALY's ex-sister-in-

law. A person named H.W. then took over as office manager in SUBJECT PREMISES-1, although

H.W. was also eventually fired because of conflicts with A.C.

46

b.      After H.W. left employment at SUBJECT PREMISES-1, HEALY started dispensing a lot of narcotics. HEALY also began minimizing his standard of care toward his weight loss patients. Initially, HEALY monitored his weight-loss patients with blood work and made sure they were healthy, but by December 2008, HEALY stopped caring—a patient could have a heart condition or some other serious condition, but HEALY would not know it. HEALY would just give the patient weight control pills as though the pills were candy. A lot of HEALY's patients abuse the diet pills because the diet pills are stimulants.

c.      When HEALY initially started prescribing Vicodin, Norco, Lorcet, Valium, and Xanax, it was to regular patients and it did not seem suspicious. Little by little, as the years went by, HEALY's dispensing got completely out of control. CS-5 left CS-1's job at SUBJECT PREMISES-1 because CS-5 had been threatened by patients when CS-5 turned the patients away. When CS-5 turned patients away, some of the patients would approach HEALY, and HEALY would give the patients the pills anyway.

d.      After leaving SUBJECT PREMISES-1, CS-5 went to HEALY's Sherman Oaks office, where HEALY was also dispensing narcotics and diet pills. HEALY's Sherman Oaks office subsequently closed, and CS-5 returned to SUBJECT PREMISES-1 in Duarte and found that the situation at SUBJECT PREMISES-1 had gotten even worse. At SUBJECT PREMISES-1, HEALY had 18-year-olds coming in, claiming they had bad pain or a small laceration—and HEALY would give them narcotics. HEALY would get patients addicted to narcotics. HEALY would ask patients that came to SUBJECT PREMISES-1 if they wanted the "party size" or the "family size."

47

e.     CS-5 still goes into SUBJECT PREMISES-1 to see CS-4 and CS-5 has talked to some of HEALY's patients.  One of HEALY's patients, M.M., recently told CS-5 that HEALY knows his patients are turning around and selling the pills they get from HEALY, but HEALY just tells his patients to make sure nobody else knows they are selling the pills they get from HEALY. M.M. told CS-5 that HEALY would sometimes give his patients half of what they were requesting, but usually HEALY would just ask patients if they were getting the "family size" or the "party size" that day.  HEALYS gave his patients Vicodin, Lorcet, Norco, Darvocet, Tylenol with codeine, Valium, Xanax, and Phenergan with codeine; and now he also sells Oxycontin and MScontin.

f.     Parents would call SUBJECT PREMISES-1 and complain about the narcotics their children were getting from HEALY.  CS-5 believed that HEALY's 18-year-old patients were just kids, and CS-5 believed that HEALY's 18-year-old patients would go to parties and sell the pills they got from HEALY to kids even younger than they were.  CS-5 has seen clean cut and healthy people come into SUBJECT PREMISES-1; HEALY lets them take narcotics without limitation and now those same clean-cut and healthy people have lost their families and jobs, and are now dirty and appear to be homeless.  Young kids now look twice their age because of their drug use.

g.     One patient, J.B., threatened to go home from SUBJECT PREMISES-1, get a gun, and come back to SUBJECT PREMISES-1 if CS-5 did not allow J.B. to get narcotics. J.B. had received a large amount of narcotics the previous day, and CS-5 told HEALY about J.B.'s threat. HEALY gave J.B. the drugs anyway.

h.     CS-5 told HEALY and A.C. that the narcotics dispensing was out of control. HEALY told CS-5 that he would talk to his patients. But HEALY's patients would then come out of

48

the examination room laughing with as many as six, ten, or twelve bottles of pills. HEALY had his

own bags that he used for prescription bottles, but patients now come into SUBJECT PREMISES-1

with backpacks and shopping bags. CS-5 has heard that patients come in before and after office

hours.

        i.      Patients would come into SUBJECT PREMISES-1 and pay $65.00 for an

office visit. A patient would sign in, and the office employee at SUBJECT PREMISES-1 would get

the patient's chart, which was in a computer at SUBJECT PREMISES-1. The office employee

would fill out the chart slip, and the patient would attach it to a clipboard with the cash attached.

The office employee would take the patient back to an examination room, and the patient would be

back out in five minutes. CS-5 believed that the patients would tell HEALY how much narcotics

they wanted, and when CS-5 worked at SUBJECT PREMISES-1, there was a limit of 180 pills per

day, but some patients would get 360 pills. Occasionally, a patient would receive 180 pills in the

office, and still have a prescription in the patient's hand. A lot of pharmacies would not fill

HEALY's prescriptions, however, which is why HEALY started dispensing more from SUBJECT

PREMISES-1. Pharmacies would call HEALY and say that HEALY's patients were receiving

narcotics from several doctors and HEALY should not see those patients; if the pharmacy kept the

prescription, HEALY would just give the patient a new one. Patients would often come into

SUBJECT PREMISES-1 with excuses about why they needed new prescriptions, and HEALY

would just write the patients new prescriptions.

        j.      10 to 15 patients would come to SUBJECT PREMISES-1 for narcotics on a

daily basis. There was a time when HEALY was on probation and limited his dispensing of

narcotics, but then the patients would just send their girlfriends to SUBJECT PREMISES-1 and HEALY would give narcotics to the girlfriends. HEALY would give brand new patients 180 pills without an examination. HEALY would sometimes chart in detail, but it was fraudulent. Some of the patients were not even seen by HEALY.

       k.      One of HEALY's patients, S.G., was a complete drug addict. CS-5 felt sorry for S.G.'s little girl, whom S.G. brought to the office. CS-5 said that S.G. bounced checks all the time, but HEALY did not care because S.G. would just pay cash on subsequent visits. S.G. threatened the office employees at SUBJECT PREMISES-1 violently if they would not allow him to see HEALY.

       l.      At one time, another doctor named P.O. worked at SUBJECT PREMISES-1, but P.O. left SUBJECT PREMISES-1 for the same reasons CS-5 left. If pain patients went to P.O., P.O. would give the patients 60 pills and tell them not to come back to SUBJECT PREMISES-1 for two months. CS-5 said the narcotics patients hated P.O. and threatened P.O. often.

       m.      Approximately three years ago, P.O. was notified that false prescriptions were being called in to pharmacies in P.O.'s name. After an investigation, it became known that HEALY's youngest son, B.H., who was using P.O.'s name. P.O. wanted to press charges, but HEALY threatened P.O. with the loss of P.O.'s job.

       n.      CS-5 does not know why HEALY gives his patients whatever narcotics the patients want, but CS-5 suspects HEALY does so because of the amount of money HEALY was able to make. CS-5 believes HEALY is really greedy. When CS-5 would tell A.C. that patients were threatening the office employees at SUBJECT PREMISES-1 or coming too often to SUBJECT

PREMISES-1, A.C. would tell CS-5 to stop complaining, because patients coming into SUBJECT PREMISES-1 was what was paying CS-5's paycheck. A.C. did not care about the situation at SUBJECT PREMISES-1 because A.C. was sharing the money with HEALY. The problems began when A.C. arrived, and CS-5 believed A.C. was encouraging HEALY's dispensing activity.

        o.     CS-5 said the business at SUBJECT PREMISES-1 was bringing in $1,000 to $2,000 per day when CS-5 was working at SUBJECT PREMISES-1. It is a lot more than that now.

        p.     Narcotics patients R.F., D.L., J.L., and another patient CS-5 could not remember, have all told CS-5 that HEALY has told the patients that HEALY would give the patients half an order of pills and tell the patients to take the pills home or get rid of them, and then come back to HEALY for the other half. CS-5 thought one of the patients might have been a minor.

        q.     HEALY would let his son take pills out of SUBJECT PREMISES-1 when HEALY's son was 16 or 17, and HEALY knew that his son was going to give the pills to his friends. HEALY's son had a prescription drug problem of his own, but CS-5 heard that HEALY's son was not taking pills any more.

        r.     HEALY ordered drugs from different suppliers, because he was ordering so much. CS-5 did not know HEALY's current suppliers.

        s.     There were perhaps five to ten medical patients per day at SUBJECT PREMISES-1. Everyone else was at SUBJECT PREMISES-1 for either narcotics or weight loss. HEALY's weight loss patients paid $48.00 a week for an office visit, and some also purchased weight loss food. Some weight-loss patients also paid for extra appetite-suppressant or water pills.

t.      HEALY did not always see the narcotics patients when they came to SUBJECT PREMISES-1, and HEALY would just bring the narcotics patients bags of prescription drugs from the back of SUBJECT PREMISES-1 and put them on the counter. Occasionally, HEALY would be in his office at SUBJECT PREMISES-1 and would just approve a patient's request and give it to the office employees to fill. CS-5 would tell HEALY that the office staff were not supposed to dispense narcotics and were not pharmacy trained, but HEALY and A.C. would tell the office staff that it was alright for the office staff to dispense narcotics because they were doing so under HEALY's license. On several occasions CS-5 told A.C. that CS-5 should not be dispensing pills, and A.C. told CS-5 to just do as CS-5 was told.

u.      CS-5 believes A.C. works at SUBJECT PREMISES-1 just for the money; all of a sudden, A.C. is driving a Mercedes-Benz and A.C. and HEALY just got a house in Arcadia that A.C. told CS-5 was from A.C.'s money. A.C. also did all of HEALY's banking; on one occasion, a bank called with questions about HEALY's account, and HEALY told CS-5 that HEALY did not know the information because A.C. had all of the passwords to HEALY's accounts. HEALY's daughter was in medical school, and HEALY's daughter dislikes A.C.

v.      CS-5 has no medical training. HEALY had CS-5 give shots to patients, and CS-5 occasionally took patients' vital signs. CS-5 was told this was ok because CS-5 was working under HEALY's license. A nurse who previously worked at SUBJECT PREMISES-1 was doing things that HEALY should have been doing.

w.    Even without any medical training, it was CS-5's opinion HEALY was over-prescribing patients. When certain patients came into SUBJECT PREMISES-1, CS-5 could tell they were heavy narcotics users and should not be getting the pills.

x.    CS-5 worked for HEALY off-and-on for nine years. When CS-5 first started working for HEALY, HEALY was not like this; HEALY was a good doctor back then. CS-5 believed it was the cash and A.C.'s influence that accounted for the change in HEALY. CS-5 had heard that HEALY is a millionaire, but HEALY is very frugal and does not spend much money. CS-5 does not believe HEALY uses any drugs, other than Xanax and injections of human growth hormone.

y.    HEALY has one patient, M.M. who CS-5 still sees. M.M. can barely walk or function because M.M. is so drugged up. HEALY does this to everyone. There were two patients who worked for the City of Buena Park, and they used to flirt with the women in SUBJECT PREMISES-1 even though the Buena Park employees were married. The Buena Park employees were clean-cut and good-looking, with good jobs and cute kids. CS-5 saw the Buena Park employees recently. The Buena Park employees had lost their jobs and their families. Their wives would call SUBJECT PREMISES-1 crying, and now both Buena Park employees look like they are homeless. These were good people, and HEALY just ruined their lives.

z.    HEALY sees patients who can barely function and he still allows them to leave with prescription narcotics. CS-5 has seen patients drink a whole bottle of Phenergan before they leave SUBJECT PREMISES-1; CS-5 cannot even take a teaspoon of Phenergan without being knocked out. People have gotten in accidents after they have left SUBJECT PREMISES-1.

53

aa.    Some of HEALY's patients have died due to negligent care, but HEALY either pays the patients off or his lawyer gets him out of everything.  HEALY makes jokes that people can take him to court, but his lawyer will get him out of it, and that is why he pays for a good lawyer.

bb.    HEALY dispenses Suboxone, which is used in detoxification for opiate addition, but it is much more expensive than the opiates themselves.  CS-5 believes HEALY would try Suboxone with patients just so HEALY could chart that he tried to get the patient off of the narcotics.

cc.    CS-5 felt like a drug dealer when CS-5 worked at SUBJECT PREMISES-1. Patients call HEALY "The Candy Man."  Patients would joke that HEALY would ask them if they wanted the "family size" or the "party size."  Occasionally, when HEALY was not at SUBJECT PREMISES-1 and a patient was desperate or threatening, the office employees would call HEALY. HEALY would tell the office employees to just give the prescription narcotics to the patient and leave the request on HEALY'S desk.  HEALY would sign it later.

**INTERVIEW OF PHARMACIST IN JANUARY 2009**

26.    Based on my training and experience, I know the following events and/or factors often raise suspicion when they occur at legitimate pharmacies:

a.    Multiple individuals present prescriptions for the same narcotics at the same pharmacy at the same time.

b.    Individuals presenting prescriptions to be filled pay cash to the pharmacies to fill the prescriptions, even though the price of the narcotics is often in excess of $1,000.

54

27.    Based on the above information, I went to the Target Pharmacy in Duarte, California, which, according to CS-4, will not fill prescriptions from HEALY. I interviewed Pharmacist K.O. on January 13, 2009. K.O. stated the following:

a.    K.O. has been a pharmacist for approximately two years at the Target Pharmacy in Duarte, California. K.O. was warned by the preceding pharmacist at Target to watch out for prescriptions from HEALY and to not fill his prescriptions for controlled narcotics. K.O. showed me the computer at the Target pharmacy in Duarte, where a notation is displayed whenever HEALY's name is queried. The notation reads: "do not fill controls."

b.    HEALY's prescriptions were suspicious because many of them came in back-to-back and were for large quantities of controlled substances. Also, HEALY's prescriptions were usually paid for in cash. K.O. thought word had gotten around that Target would not fill HEALY's prescriptions. K.O. believed this because K.O. only sees a few of HEALY's prescriptions from regular customers, and K.O. knows the diagnoses for these regular customers.

c.    K.O. printed me a 25-page report detailing HEALY's prescriptions filled at Target Pharmacy in Duarte, California, from January 2005 to the present. M.M. filled a prescription for 150 hydrocodone tablets on June 27, 2005. K.O. showed me a copy of the original prescription, which appeared to be signed by Daniel HEALY.

## SURVEILLANCE AND TRAFFIC STOPS AT AND NEAR SUBJECT PREMISES-1

### November 17, 2008 Surveillance at SUBJECT PREMISES-1 and SUBJECT PREMISES-2

28.    On November 17, 2008, SA Nomady conducted surveillance at and near SUBJECT PREMISES-1 and SUBJECT PREMISES-2. SA Nomady learned the following:

a.      At approximately 4:15 p.m., an unidentified white male, approximately 20 years old, entered SUBJECT PREMISES-1. Approximately five minutes later, the same unidentified male walked out of SUBJECT PREMISES-1 carrying a white bag that he was not carrying when he entered SUBJECT PREMISES-1. The unidentified male departed in a vehicle (CA Lic. Plate 5HQD378; r/o P.F.).

b.      At approximately 5:15 p.m., HEALY walked out the back door of SUBJECT PREMISES-1 and placed a box inside the trunk of SUBJECT PREMISES-3, a silver Honda (CA Lic. Plate 5WZF879; r/o E.H. or Daniel James HEALY). HEALY walked back to SUBJECT PREMISES-1 and then returned to SUBJECT PREMISES-3 and entered the driver's side. HEALY drove SUBJECT PREMISES-3 to SUBJECT PREMISES-2, located at 1139 Valencia Way, Arcadia. HEALY parked SUBJECT PREMISES-3 and entered SUBJECT PREMISES-2.

**December 2 and 3, 2008, Surveillance and Traffic Stops at and near SUBJECT PREMISES-1**

29.     On December 2, 2008, at approximately 2:00 p.m., and on December 3, 2008, at approximately 11:00 a.m., DEA SAs and Monrovia Police Department Officers established surveillance at SUBJECT PREMISES-1 in an effort to verify the scheme described by CS-1, CS-2, CS-3, CS-4, and CS-5 involving individuals receiving large quantities of controlled substances from HEALY. From my own observations and after speaking with the surveillance agents/officers and reviewing their reports, I have learned the following:

a.      At approximately 3:00 pm, on December 2, 2008, two unidentified white males, approximately 20 years old, entered SUBJECT PREMISES-1 and subsequently exited SUBJECT PREMISES-1 at approximately 3:45 pm. Both unidentified males were carrying semi-

56

translucent bags when they left SUBJECT PREMISES-1, which they were not carrying when they

entered SUBJECT PREMISES-1. Each bag carried by the unidentified males contained several pill

bottles. SA Nomady notified Detective Doney, and requested that Detective Doney approach the two

males or stop the vehicle for a traffic violation if possible. Detective Doney observed the two males

at the intersection of Oak and Huntington in Duarte. Detective Doney identified one male as W.S.

and the other male as R.F. Detective Doney observed W.S. in a green Jeep (CA License 5HQD378;

r/o P.F.) and R.F. on foot near the Jeep. Detective Doney approached W.S. and R.F. and asked them

what was in their bags. W.S. had one bottle of 120 hydrocodone, three bottles of 90 tablets of Norco,

three bottles of 90 tablets of hydrocodone, and three bottles of 90 tablets of Xanax. R.F. had one

bottle of 120 tablets of Norco, one bottle of 360 tablets of Xanax, one bottle of 120 tablets of

hydrocodone, and two bottles of promethazine with codeine cough syrup.

      b.    At approximately 3:30 p.m. on December 2, 2008, A.L. and L.B. entered

SUBJECT PREMISES-1 and subsequently exited at approximately 4:00 p.m. A.L. and L.B. got into

a Mitsubishi Outlander (CA License 5FEE824; r/o T.B.). I notified Detective Doney and requested

that the vehicle be stopped for a traffic violation if possible. Detective Doney contacted Agent

Villalobos and Detective Loy, who made a traffic stop of the Mitsubishi Outlander, driven by L.B.,

for speeding and making an unsafe turn. Detective Loy asked L.B. if L.B. had any medications in the

vehicle and L.B. showed Detective Loy and Agent Villalobos a bag containing three bottles of 120

tablets of hydrocodone (in each bottle), one bottle of 120 tablets of Xanax, and one bottle of 30

tablets of Lortab (all prescribed to A.L.). L.B. also showed the detectives two bottles of 30 tablets of

hydrocodone that were prescribed to L.B.

c.      On December 3, 2008, at approximately 11:00 a.m., unidentified individuals entered and exited SUBJECT PREMISES-1. At approximately 12:00 p.m., an unidentified white male, approximately 25 years old, exited SUBJECT PREMISES-1 carrying a semi-translucent bag that appeared to contain pharmaceutical bottles. The unidentified male entered a Dodge Neon. SA Nomady notified Detective Doney and requested that the unidentified male be stopped for a traffic violation if possible. Detective Doney contacted Agent Villalobos, who made a traffic stop of the Dodge Neon, driven by T.S., for not wearing his seatbelt. Agent Villalobos asked T.S. if T.S. had any medications in the vehicle and T.S. showed Agent Villalobos a bag containing one bottle of 120 tablets of hydrocodone and one bottle of 30 tablets of Lortab.

d.      At approximately 4:45 p.m. on December 3, 2008, A.L. and L.B., who was carrying a large purse, both entered the front door at SUBJECT PREMISES-1. SA Nomady and I had observed L.B. and A.L. at SUBJECT PREMISES-1 the previous day, December 2, 2008. At approximately 5:00 pm, SA Nomady observed L.B., carrying a large purse, and A.L., exit SUBJECT PREMISES-1. I observed A.L. and L.B. enter a Mitsubishi Outlander and depart the parking lot behind SUBJECT PREMISES-1.

**INFORMATION REGARDING HEALY PATIENT M.L.**

30.      On December 29, 2008, R.L. contacted DEA regarding his brother, M.L., who is a patient of HEALY. SA Nomady and I interviewed R.L. on January 7, 2009. R.L. stated the following:

a.      Approximately three years ago, R.L.'s brother, M.L., went with M.L.'s wife J.L. to HEALY's office for J.L. to start a weight loss program. R.L. believes that is when M.L. first

learned of HEALY and began taking pain pills. R.L. and J.L. did not know M.L. was addicted to pain pills. R.L. and J.L. thought M.L.'s significant weight loss, hearing loss, and liver problems were a result of Tuberculosis. M.L. had gone to another doctor regarding his hearing loss. The other doctor had run tests and determined that M.L. was taking opiates. R.L. knew something was really wrong with M.L. when M.L. lost his hearing completely in August 2008 and was sleeping all the time. M.L. was taking 20-30 Norco tablets per day for migraines.

      b.      The day after Thanksgiving 2008, M.L. left his family in Ohio to come back to California by himself. M.L. totaled his car while leaving Los Angeles International Airport. R.L. called their father to pick M.L. up and when their father got to M.L., M.L. asked their father to take M.L. to SUBJECT PREMISES-1. R.L.'s father called R.L. and told him he had brought M.L. to SUBJECT PREMISES-1 and something did not seem right. R.L. went to SUBJECT PREMISES-1 immediately and observed a man who was obviously an addict give a receptionist $1,000 cash, which was placed into a money-counter. The addict left with a bag of pill bottles. R.L. walked inside the examination room where his brother was with HEALY. R.L. confronted HEALY about giving M.L. opiates. R.L. told HEALY his brother was addicted to opiates and that HEALY should not be giving M.L. any. R.L. told HEALY that R.L. would take legal action and report HEALY. HEALY responded with, "okay, okay." M.L. was very angry that R.L. confronted HEALY. The following Monday, M.L. went back to HEALY and got pills from HEALY.

      c.      On December 2, 2008, M.L. entered rehabilitation for his drug addiction but checked himself out soon thereafter. M.L. entered rehabilitation again on December 9, 2008, and lasted until December 19, 2008, but then M.L. went to HEALY again. M.L. once told R.L. that M.L.

got pills somewhere in downtown Los Angeles, but R.L. believed M.L. told R.L. this so R.L. would

not go back to confront HEALY.

        d.     Credit card statements for M.L. showed 12 separate transactions paid to "Kind

Care – Duarte, CA" for a total of $2,520 during approximately a one-month period from November

10, 2008 to December 9, 2008. Many of the transactions were billed in amounts of $200 or $400.

    31.     On January 12, 2009, SA Nomady and I interviewed M.L.'s wife, J.L., who told us

the following:

        a.     J.L.'s husband M.L. was a stay-at-home father whom J.L. recently learned was

addicted to opiates. J.L. thought her husband's weight loss, hearing loss, and liver problems were a

result of Tuberculosis. Drug screens determined M.L. was taking opiates. M.L. has lost his hearing

completely and looks like a skeleton.

        b.     At Thanksgiving in Ohio this past year, things got really bad. M.L. left early

to go home and then totaled his car. J.L.'s brother-in-law R.L. called J.L. and said M.L. was going to

HEALY in Duarte, CA. J.L. had gone to HEALY for weight loss treatment several years before and

J.L. believes that is how M.L. found out about HEALY. J.L. has called SUBJECT PREMISES-1

several times and left messages, but HEALY has never returned J.L.'s calls. After J.L. called

SUBJECT PREMISES-1, J.L. started receiving insurance bills in the mail for M.L. for "K C Medical

Corporation." J.L. thought it was odd because all the claims date back to May 2008 even though

they were all listed as though they were processed during the first two weeks of December.

        c.     J.L. cancelled all of M.L.'s banking and credit accounts when J.L. noticed all

the transactions for "Kind Care –Duarte, CA." J.L. used to question M.L. about cash advances on

the credit cards, and M.L. told J.L. it was for their kids.  J.L. told M.L. he had to go to drug

rehabilitation.  M.L. entered rehabilitation twice in December 2008, but checked out both times.

M.L. is now staying in a hotel.  To J.L.'s knowledge, M.L. does not have access to money to buy

pills.

**January 14, 2009, SURVEILLANCE AT SUBJECT PREMISES-1**

    32.    On January 14, 2009, CS-4, wearing an undercover video/audio wire, recorded

activity inside SUBJECT PREMISES-1.  Along with DEA SAs and Monrovia Police Department

Officers, I monitored the audio of the undercover wire in real time, and the next day I watched the

video recording and debriefed CS-4.  In doing so, I learned the following:

    a.    On January 14, 2009, a patient identified by CS-4 as a homeless man named

W.M., arrived at SUBJECT PREMISES-1 and signed in at the front desk.  W.M. stated he was there

for Vicodin.  After approximately ten minutes, W.M. handed $200 cash to CS-4 for a bag containing

240 Vicodin.  CS-4 later confirmed that W.M. did not see HEALY in person, and that HEALY just

signed the request form for the Vicodin for W.M.  It was CS-4 who handed the bag containing the

Vicodin to W.M.

    b.    On January 14, 2009, a patient identified by CS-4 as D.R., arrived at

SUBJECT PREMISES-1 and signed in at the front desk.  D.R. stated he was there for Percocet.

After approximately 15 minutes, D.R. handed CS-4 $20 dollar bills.  CS-4 later told me D.R. did not

see HEALY, and that HEALY also signed the request form for D.R. for the Percocet.  CS-4

confirmed to me that D.R. handed him/her $100 total and received 100 Percocet.  CS-4 said that

D.R. was also at SUBJECT PREMISES-1 on January 13, 2009, and also received 100 Percocet.

c.    CS-4 confirmed that other individuals observed at SUBJECT PREMISES-1 on the video/audio wire also obtained controlled substances in exchange for cash or checks without ever being examined by HEALY.

## HEALY'S ESTIMATED PROFIT FROM ILLEGAL DISPENSING OF CONTROLLED SUBSTANCES

33.    During a search of the dumpster behind SUBJECT PREMISES-1 on January 21, 2009, Detective Doney found invoices from "Harvard Drug Group" to "Kind Care Medical Center, Daniel Healy, M.D." The invoices had been ripped apart, but law enforcement officers were able to tape them back together. I reviewed the taped-together invoices and learned that HEALY is charged between $40 and $110.95 per 500 count bottle of hydrocodone. The price varies, depending on the drug; Norco, Lortab, Vicodin, etc., all have different prices. Based on the above interviews of confidential sources, I know that HEALY charges $25 for 30 tablets of either Vicodin or Norco. According to DEA databases, in 2008 alone, HEALY ordered 1,013,000 hydrocodone tablets, or 2,026 hydrocodone 500-count bottles. Based on an average charge of $75.00 from Harvard Drug Group per 500 count bottle of hydrocodone, HEALY's estimated profit on hydrocodone tablets alone in 2008 was $688,840.

## INFORMATION THAT HEALY IS CURRENTLY RESIDING AT SUBJECT PREMISES-2

34.    Recent investigation indicates HEALY currently resides at SUBJECT PREMISES-2:

a.    On December 1, 2008, I reviewed California Department of Motor Vehicle records for HEALY. These records show that a 1998 Mercedes, which is SUBJECT PREMISES-4, is registered to Daniel J. HEALY at SUBJECT PREMISES-2.

b.    On December 22, 2008, I subpoenaed Southern California Edison for records

for SUBJECT PREMISES-2. These records show that HEALY's paramour and office

manager, A.C., is the current subscriber to the utilities at SUBJECT PREMISES-2. According to

Southern California Edison, A.C.'s employer is listed as KC Medical Corporation.

c.    On several occasions during the past several months, other DEA SAs,

Monrovia Police Department Detectives, and I have conducted surveillance of SUBJECT

PREMISES-2. On several of these occasions, vehicles known to be driven by HEALY have been

parked in the driveway of the residence, including SUBJECT PREMISES-4—the 1998 Mercedes—

which is registered to HEALY at SUBJECT PREMISES-2. In addition, on January 21, 2009, at

approximately 5:00 a.m., Detective Doney observed HEALY enter SUBJECT PREMISES-3, which

was parked at SUBJECT PREMISES-2, and drive to SUBJECT PREMISES-1.

d.    According to CS-4, on one occasion when A.C. was being nice to CS-4, A.C.

took CS-4 to the house A.C. shares with HEALY in Arcadia, California. A.C. gave CS-4 a tour of

the home and showed CS-4 several bedrooms, one of which A.C. said was HEALY's bedroom.

e.    CS-1 told me that CS-1 was friends with B.H., the son of HEALY. CS-1 said

that CS-1 played in a band with B.H. CS-1 went to HEALY's house often and knew B.H.'s father,

HEALY. CS-1 said that CS-1 went to HEALY's old house in Duarte, and SUBJECT PREMISES-2,

HEALY's new house in Arcadia.

f.    CS-5 told me that A.C. is involved with HEALY for the money. All of a

sudden, A.C. is driving a Mercedes-Benz and A.C. and HEALY just got a house in Arcadia that A.C.

said was from A.C.'s money.

63

g.      On December 17, 2008, after SUBJECT PREMISES-1 was robbed, HEALY

filed a police report with the Temple City Sherriff's Station, in which HEALY listed SUBJECT

PREMISES-2 as his residence.

35.     Based upon my training and experience, I believe that these facts indicating that

SUBJECT PREMISES-2 is HEALY's residence make it likely that evidence of HEALY's drug

trafficking activities will be found at SUBJECT PREMISES-2.

## ADDITIONAL    PROCEDURES    REGARDING    THE    REQUESTED    PATIENT INFORMATION

36.     As noted above, this investigation has revealed evidence that HEALY has been

dispensing and prescribing controlled substances from SUBJECT PREMISES-1 to patients from at

least February 2006 (when CS-1 started receiving controlled substances from HEALY according to

the CURES report) to the present, outside the scope of professional practice, and that evidence of

these offenses will be found at SUBJECT PREMISES-1 and SUBJECT PREMISES-2. To minimize

disruption to any legitimate medical needs of patients, the seizing agents will implement the

procedures set forth in Attachment C. The procedures provide that, upon written request from a

patient, the government will provide a copy within 48 hours (excluding weekends and holidays) of

any medical treatment information it has seized regarding that patient.

37.     As set forth above, this investigation has revealed evidence relating to the manner and

method by which HEALY maintains records and patient files at SUBJECT PREMISES-1 for both

his narcotics-seeking patients and his non-narcotics-seeking patients. On January 13, 2009, CS-4

told me the following:

64

a.    On computers in SUBJECT PREMISES-1, HEALY maintains patient information, including, but not limited to: billing records, prescribing records, dispensing records, dates of visits, and medications received by both his narcotics-seeking patients and his non-narcotics-seeking patients.

b.    When HEALY's narcotics-seeking patients arrive at SUBJECT PREMISES-1, HEALY's narcotics-seeking patients fill out request forms indicating what narcotics they would like. CS-4 or another employee of HEALY's who works at SUBJECT PREMISES-1 enters that information into a computer at SUBJECT PREMISES-1. The patients then receive copies of the receipts generated in this process, and the original receipts are shredded at SUBJECT PREMISES-1.

c.    A computer at SUBJECT PREMISES-1 failed about a year ago, so some patient information is in paper form at SUBJECT PREMISES-1; the office staff is simply behind on inputting the patient information from into a computer at SUBJECT PREMISES-1.

d.    Patient information exists on computers at SUBJECT PREMISES-1, in electronic format, for both HEALY's narcotics-seeking patients and his non-narcotics-seeking patients.

38.    Because of the manner in which HEALY stores patient information on digital devices (as defined in subparagraph 41(p) below) at SUBJECT PREMISES-1, seizure of the digital devices (as defined in subparagraph 41(p) below) at SUBJECT PREMISES-1 or obtaining a data image (as defined in subparagraph 41(q)(iii) below) of the digital devices (as defined in subparagraph 41(p) below) at SUBJECT PREMISES-1 may include seizure of both items to be seized, as listed in paragraph 41 below, and items that are not listed as items to be seized in paragraph 41 below.

Among the items not listed as items to be seized in paragraph 41 may be patient records and information for HEALY's non-narcotics-seeking patients. In order to find the items to be seized, as listed in paragraph 41 below, while to the extent possible excluding from search the items not listed as items to be seized in paragraph 41, including the patient records and information for HEALY's non-narcotics-seeking patients, the government will follow the following procedures, which will apply to each digital device or data image seized or imaged at SUBJECT PREMISES-1:

      a.     Law enforcement personnel and computer personnel, as defined in subparagraph 41(q)(i) below, will either seize or create on-site data images of the digital devices in SUBJECT PREMISES-1, under the procedures set forth in subparagraph 41(q) below.

      b.     After law enforcement personnel and computer personnel either seize or create on-site data images of the digital devices in SUBJECT PREMISES-1, under the procedures set forth in subparagraph 41(q) below, computer personnel will do the following for each digital device or data image:

      i.     Computer personnel will duplicate the digital devices or data images seized and make a forensically sound "archive copy" of each digital device or data image. The archive copy will be a duplicate of the original digital device or data image that was originally located or imaged at SUBJECT PREMISES-1 (the "original"). The original and the archive copy created by computer personnel will be returned by computer personnel in a chain of custody to law enforcement personnel.

      ii.     Law enforcement personnel will immediately seal the original and maintain it under seal unless and until ordered by the Court to return the original to HEALY.

iii.   Law enforcement and/or computer personnel will create a report, compact disk, dvd, or similar finished product (the "finished product") from the archive copy that accurately contains the information listed in paragraph 41 below as items to be seized.

iv.   Law enforcement personnel will maintain the archive copy as original evidence.

## COMPUTER DATA

39.   Based on my training and experience I know that doctors routinely store information about patients on computers, and according to CS-4 who works in the office, a computer is utilized for maintaining patient information in the reception area of SUBJECT PREMISES-1. As a result of this practice and the specific observation of a computer at SUBJECT PREMISES-1, I seek authority to seize and examine any computers and electronic storage devices found at SUBJECT PREMISES-1 and SUBJECT PREMISES-2.

40.   Based upon my training and experience and information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search digital devices for data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also

be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

      b.      Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Digital devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since digital data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the digital devices from which the data will be extracted.

      c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

      d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the

extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## ITEMS TO BE SEIZED

41.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, will be found at SUBJECT PREMISES-1 and SUBJECT PREMISES-2:

a.     United States currency in an amount exceeding $1,000.00.

b.     Controlled substances, including but not limited to, oxycodone, hydrocodone, fentanyl, methadone, buprenorphine, alprazolam, morphine, acetaminophen with codeine, and phenergan with codeine.

c.     For the time period February 2006 to the present: Documents noting the price, quantity and/or times when controlled substances, including but not limited to, oxycodone, hydrocodone, buprenorhpine, methadone, or alprazolam was requested, prescribed, obtained, transferred, sold, distributed, and or/concealed, including, but not limited to: invoices from pharmaceutical companies, ledgers, customer lists, appointment books, pharmacy information,

69

correspondence, notations, logs, receipts, journals, books, and records.

   d. For the time period February 2006 to the present: medical records, patient files, sign-in sheets, charts, billing information, payment records, and identification documents that refer to any patients prescribed or dispensed controlled substances, including but not limited to, oxycodone, hydrocodone, buprenorphine, fentanyl, methadone, or alprazolam by HEALY according to sign-in sheets, receipts, patient file notations, documents in patient files, and/or the Department of Justice, Bureau of Narcotic Enforcement Controlled Substance Utilization Review and Evaluation System (the "CURES" report).

   e. For the time period February 2006 to the present: Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, emails, personal notes, and other items reflecting names, addresses and telephone numbers, communications, and illegal activities of associates in drug trafficking activities.

   f. For the time period February 2006 to the present: Bank account records, wire transfer records, bank statements, safe deposit box keys and records, and financial records showing payment, receipt, concealment, transfer, or movement of money.

   g. For the time period February 2006 to the present: Documents, including, but not limited to emails, check registers, cancelled checks, deposit items, financial instruments, facsimile transmissions, or ledgers that refer to any person who was prescribed, provided with, or sold a controlled substance by HEALY.

h.    For the time period February 2006 to the present: Memoranda concerning, correspondence with and/or letters to or from any insurance company that refer to any person who was prescribed, provided with, or sold a controlled substance by HEALY.

i.    For the time period February 2006 to the present: Financial instruments purchased with currency in the sum of $1,000 or more.

j.    For the time period February 2006 to the present: records, documents, titles, mortgage paperwork, and deeds reflecting the purchase, rental or lease of any real estate, car, truck, motorcycle, boat, plane, RV, and/or any other property.

k.    Telephone paging devices, beepers, mobile telephones, car telephones, and other communication devices.

l.    Handguns, shotguns, and other firearms.

m.    Indicia of occupancy, residency, rental or ownership of the SUBJECT PREMISES, namely, utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, and escrow documents.

n.    Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, conveyances and/or other residences.

o.    As used above, the term oxycodone includes "Oxycontin" and "Percocet" and other drugs containing oxycodone marketed under various brand names, and the term hydrocodone includes "Vicodin," "Norco," and other drugs containing hydrocodone marketed under various brand names.

71

p.    As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device. The term "digital device" includes any electronic device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media; and security devices.

q.    In searching for data capable of being read, stored or interpreted by a digital device, law enforcement personnel executing this search warrant will employ the following procedure:

i.    Upon securing the premises, the law enforcement personnel executing the search warrant will, to the extent possible without requiring the use of special training in searching and seizing digital data, seek to determine if any digital device contains data falling within the scope of the items to be seized in the warrant. If they can make this determination without jeopardizing the integrity of the digital data and a digital device contains data falling within the scope of the items to be seized in the warrant, that digital device will be seized. If they cannot make this determination, or they believe they cannot make this determination, without jeopardizing the integrity of the digital data, law enforcement personnel trained in searching and seizing digital data (the "computer personnel") will be consulted (either on-site or off-site) to determine whether the

digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the digital device.

ii.    If the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, it will be searched on-site and seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

iii.    If the digital device cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer personnel will determine whether it is practical to create a forensically sound image of the data contained on the digital device during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve that data. If it is practical, and the digital device cannot be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the computer personnel will make a forensically sound image of the data contained on the digital device (a "data image") during the execution of this search and shall seize the data image rather than the digital device itself.

iv.    If the computer personnel determine it is not practical to perform an on-site search of the digital device or make an on-site data image within a reasonable period of time and without jeopardizing the ability to preserve data, then the digital device will be seized and transported to an appropriate law enforcement laboratory for review. The digital devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

v.      In searching the digital device or data image, the computer personnel may examine all of the data contained in the digital device or data image to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

vi.      If the computer personnel seize the digital device pursuant to subparagraph iv above or make a data image pursuant to subparagraph iii above, the computer personnel will initially search the digital device or data image within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant. If, after conducting such an initial search, the case agents determine that the digital device or data image contains any data falling within the list of items to be seized pursuant to this warrant, the government will either (1) return the digital device, keeping a data image for further analysis, provided that, prior to such return, the owner and user(s) of the digital device stipulate individually and in writing to the authenticity and accuracy of the data image or (2) seek an order of the Court allowing the government to retain the original digital device for further analysis. If the digital device or data image does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the digital device or delete the data image. If the government needs additional time to determine whether the digital device or data image contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

74

r.    In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i.    Any digital device capable of being used to commit, further or store evidence of the offense listed above;

ii.    Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

iv.    Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

v.    Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

vi.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

vii.    Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

## CONCLUSION

42.    Based on the foregoing, and on my training and experience, I believe that probable cause exists to believe that Daniel HEALY, M.D., has violated Title 21 U.S.C. § 841(a)(1), Unlawful Distribution of Controlled Substances and Title 21 U.S.C. § 846, Conspiracy to Distribute Controlled Substances.

43.    Based on the foregoing, it is my opinion that evidence, fruits, and instrumentalities evidencing violations of Title 21 U.S.C. § 841(a)(1), Unlawful Distribution of Controlled Substances, and Title 21 U.S.C. § 846, Conspiracy to Distribute Controlled Substances, as set forth in Attachment B, are being maintained on the Subject Premises, as set forth in Attachment A.

Susannah Herkert, Diversion Investigator
Drug Enforcement Administration

Subscribed and sworn to me before me on this 3rd day of February, 2009.

THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE